Commonwealth *vs.* Kevin F. Lynch.

Norfolk. December 8, 1998. - January 8, 1999.

Present: Wilkins, C.J., Lynch, Greaney, Fried, & Ireland, JJ.

*Joint Enterprise. Evidence,* Joint enterprise. *Homicide. Practice, Criminal,* Capital case.

Evidence at the trial of an indictment for murder in the first degree, including reasonable inferences drawn therefrom, was ample to warrant submission of the case to the jury on the theory of joint enterprise. [620-622]

Indictments found and returned in the Superior Court Department on January 25, 1996.

The cases were tried before *Judith A. Cowin,* J.

*Carlo A. Obligato,* Committee for Public Counsel Services, for the defendant.

*Robert C. Cosgrove,* Assistant District Attorney, for the Commonwealth.

Ireland, J. The defendant was convicted by a jury of murder in the first degree as a joint venturer under theories of extreme atrocity or cruelty and felony-murder.[1] The jury also found the defendant guilty of aggravated rape. On appeal, while the defendant acknowledges that there was sufficient evidence to support the aggravated rape conviction, he argues that the evidence was insufficient to establish that he joined in the plan to kill the victim, and, therefore, a required finding of not guilty should have been entered on the murder count. The defendant also challenges as erroneous the judge's instruction on felony-murder. Finally, the defendant asks us to exercise our power under G. L. c. 278, § 33E, to order a new trial, or to reduce the verdict to murder in the second degree. We conclude that the evidence was sufficient to allow a reasonable juror to find that the defendant joined in the plan to kill the victim and rule,

[1]The verdict slip indicates that the jury specifically found the defendant guilty on each theory.

therefore, that there was no error in the judge's denial of the motion for a required finding of not guilty. We do not reach the defendant's challenge to the felony-murder instruction because the verdict is fully supported by the independent, and unchallenged, theory of extreme atrocity or cruelty. We now affirm the convictions and find no reason to grant relief under G. L. c. 278, § 33E.

1. *Background.* The seventeen year old victim was beaten, bound, raped repeatedly, and then strangled to death. Her naked body was then wrapped in a bedspread and thrown into the Granite Rail Quarry in Quincy. The body was anchored down with three cinder blocks to hold it· underwater. On November 20, 1994, the police found her body after being alerted to its presence. An examination revealed that the victim's hands and feet were tied behind her back with yellow nylon rope. A brown bedspread was around her head, and yellow nylon rope was around her neck. A boxing "hand wrap" was tightly wound and knotted around her neck. Pantyhose had been placed in her mouth and duct tape was wrapped around her mouth and neck. An autopsy determined that the cause of death was asphyxia. The autopsy could not determine if the asphyxia was brought about by smothering, strangulation, or a combination.

On January 18, 1995, Kara Lentini went to the Quincy police department and spoke with Sergeant Joseph Flaherty of the Massachusetts State police. Flaherty was investigating the murder. Lentini had formerly dated the brother of Shawn Kane.[2] As a result of this conversation, the investigation began to focus on Kane and Robert Larkin. In subsequent interviews with Larkin and Kane, the defendant's name was brought to Flaherty's attention. On March 20, 1995, Flaherty interviewed the defendant. In this interview the defendant acknowledged knowing Kane and Larkin and answered other general questions. At this time, the defendant also consented to a search of his vehicle. Two rolls of duct tape were found in the trunk during the search. Four days later Flaherty conducted a second interview with the defendant. Through other interviews conducted in the interim, Flaherty had learned that Kane had been "ripped off" by a prostitute at some earlier time and wanted to "get even with [prostitutes] because of that." Based on this information, Flaherty asked the defendant if he was aware that Kane and Larkin

---

[2]Shawn Kane is still awaiting trial for this murder at this time. At a separate trial Robert Larkin was convicted by a jury of murder in the first degree.

were picking up, beating, and robbing prostitutes. The defendant denied involvement in such activity. He did, however, recount an incident which occurred in November, 1994, when he was awakened by a woman screaming outside the door of his apartment. Kane and Larkin entered his apartment later that night and informed him that they had picked up a prostitute in Boston, driven her to Quincy, and then beaten and robbed her. The defendant denied any involvement in killing anyone or helping to dump a body in the quarry.

On July 21, 1995, Larkin's fingerprint was found on the duct tape that had been wrapped around the victim's mouth, and he was arrested. On December 27, 1995, the defendant was arrested for failing to appear before a grand jury investigating the murder. That same day Flaherty interviewed the defendant for a third time. In the course of this interview, the defendant provided his narrative of what occurred the night of the murder. He stated that he was asleep on a couch in his apartment when he observed Larkin and the victim enter the apartment and go into a bedroom. Kane then entered the apartment and put his finger to his lips, directing the defendant to be quiet. Kane then concealed himself on a set of stairs near the door to the defendant's bedroom. Shortly thereafter, the victim left the bedroom and Kane leaped off the steps onto her and began beating her and ripping her clothes off. Larkin came out of the bedroom and joined Kane in attacking her. After being attacked for some time, she started yelling, "Okay. That's enough. I'll do whatever you want." Duct tape was then used to bind her hands. She was dragged into the bedroom where each of the three took turns raping her. At one point Kane cut a section of yellow nylon rope from a spool of rope which the defendant had taken from a neighbor's home, and made a comment that the next time he went into the bedroom would be the last. The defendant was the last one to rape her. Shortly after he left the bedroom Kane and Larkin went into the bedroom and started taping up her mouth and hands. She was also blindfolded. They then took her out of the bedroom and told her that they were going to let her go. Kane then gave the nylon rope to Larkin who began to strangle her with it. Kane grabbed one end of the rope while Larkin held the other end, and they pulled on each end, strangling her. The defendant stated that during this encounter he sat and watched, and said several times, "I think she's dead." After fifteen to twenty minutes of strangulation by

Kane and Larkin, she was left lying on the floor. While she lay there her eyes were open. The defendant leaned over and poked her in one eye to see if she would react. When she did not, they concluded that she was dead. The three then devised and carried out the plan to dispose of her body in the quarry.

2. *Joint venture*. At the close of the Commonwealth's case the defendant filed a motion for a required finding of not guilty. The motion was denied. The motion was renewed at the close of the defendant's case, and was again denied. On appeal, the defendant argues that it was error for the judge to have denied the motions because the evidence was insufficient to establish that he was a joint venturer in the killing. The standard against which we view these claims is whether, viewing the evidence in the light most favorable to the Commonwealth, "a rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt." *Commonwealth* v. *Semedo*, 422 Mass. 716, 719 (1996). See *Commonwealth* v. *Andrews*, 427 Mass. 434, 440 (1998), quoting *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979) ("On appeal, we are to determine whether, 'upon viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt' " [emphasis in original]). We conclude that there was ample evidence presented to enable a rational juror to find each element of murder in the first degree on a joint venture theory beyond a reasonable doubt.[3] Therefore, the issues were properly submitted to the jury.

"The theory underlying joint enterprise is that one who aids, commands, counsels, or encourages commission of a crime while sharing with the principal the mental state required for the crime is guilty as a principal." *Commonwealth* v. *Soares*, 377 Mass. 461, 470, cert. denied, 444 U.S. 881 (1979). Liability as a joint venturer attaches where the "defendant [was] (1) present at the scene of the crime, (2) with knowledge that another intends to commit the crime or with intent to commit a crime, and (3) by agreement is willing and available to help the other if necessary." *Commonwealth* v. *Bianco*, 388 Mass. 358,

---

[3]The jury returned verdicts on two theories: extreme atrocity or cruelty and felony-murder. The defendant does not attack the finding on extreme atrocity or cruelty. Because we find that there was ample evidence to establish that the defendant was a joint venturer, we do not reach the defendant's challenge to the felony-murder instruction.

366, *S.C.*, 390 Mass. 254 (1983). While the Commonwealth must prove that the defendant shared the requisite mental intent for murder, malice aforethought, this showing can be made by drawing reasonable inferences from the facts in evidence. See *Commonwealth* v. *Pucillo*, 427 Mass. 108, 112 (1998); *Commonwealth* v. *Costa*, 407 Mass. 216, 225 (1990); *Soares*, *supra* at 471.

The defendant argues on appeal, as he did at trial, that although he actively participated in the aggravated rape of the victim and in the disposal of her body, he was not involved with the murder itself. The defendant describes himself as an "opportunist" as to the rape, and an innocent bystander as to the murder. The defendant's euphemistic characterization of his involvement in these crimes, however, does not square with the evidence. The evidence presented would have justified the jury in concluding that the defendant knew Kane and Larkin intended to kill the victim from the outset of their collective assault on her; that the duct tape used to bind her hands came from the defendant; that the defendant twice raped her while she was restrained in the bedroom; that the rope used to strangle her came from a spool of rope the defendant had taken from the home of a neighbor; that it was shortly after the defendant raped the victim for the second time that she was strangled to death as he sat and watched; that as he watched Kane and Larkin strangle her he commented on their progress by stating, "I think she's dead"; that after Kane and Larkin finished strangling her the defendant poked one of her eyes with his finger to confirm that she was dead; and that once she was dead he actively participated in the disposal of her body and lied, on multiple occasions, to the police about the matter.

Based on this evidence, and reasonable inferences drawn from it, the jury could have found each element of murder in the first degree on a joint venture theory. That the defendant was present at the murder is not in dispute. The jury could reasonably have concluded that the defendant knew Kane and Larkin intended to kill the victim; indeed the defendant admitted this in his statement to Flaherty. The jury could reasonably have found that the defendant demonstrated his willingness to participate in the entire venture by engaging in the rape of the victim, with the knowledge that Kane and Larkin intended to finish the act by killing her. Furthermore, the defendant stated that, while the victim lay dead on the floor he leaned over and

poked one of her eyes to see whether she would react. It is manifestly reasonable to infer that had she responded, the strangulation would have resumed. This volitional act by the defendant, in combination with all of his other actions as discussed above, clearly evidenced his wilful participation in the taking of the victim's life.

The defendant argues that the rape and murder were two separate and unrelated criminal acts, and that his participation was limited to the rape. While the defendant offers one possible interpretation of the evidence, it is not the only reasonable one. "[T]o the extent that conflicting inferences are possible from the evidence, it is for the jury to determine where the truth lies." *Commonwealth* v. *Bennett*, 424 Mass. 64, 68 (1997), quoting *Commonwealth* v. *Wilborne*, 382 Mass. 241, 245 (1981). The judge did not err in denying the defendant's motions and submitting the case to the jury.

3. *G. L. c. 278, § 33E.* We have reviewed the record pursuant to our duty under G. L. c. 278, § 33E, and see no reason to reduce the murder verdict or to order a new trial.

*Judgments affirmed.*