COMMONWEALTH *vs.* ROBERT F. LARKIN, THIRD.

Norfolk. February 2, 1999. - April 16, 1999.

Present: WILKINS, C.J., ABRAMS, GREANEY, FRIED, & IRELAND, JJ.

*Evidence,* Admissions and confessions, Voluntariness of statement.
*Constitutional Law,* Admissions and confessions. *Practice, Criminal,*
Admissions and confessions, Voluntariness of statement, Instructions to
jury.

A murder suspect held at a house of correction on a probation surrender war-
rant was not in custody for Miranda purposes when interviewed by police
at the house of correction, where he was not subject to any restraint in ad-
dition to his incarceration during the questioning, and where the interview
was voluntary. [432-436]
Where a murder suspect made no incriminating statements to police officers
before he was given his Miranda rights, there was no error in admitting in
evidence his subsequent post-Miranda incriminating statements. [436-438]
In a murder case, the judge correctly concluded, on the record of a hearing on
the defendant's motion to suppress his statements to police, that the
defendant's statements were voluntary beyond a reasonable doubt. [438]
There was no error in a judge's use, in instructing the jury, of a blackboard to
set forth the elements of murder, but not using the blackboard to set forth
the elements of the other offenses for which the defendant was on trial.
[439]

INDICTMENTS found and returned in the Superior Court Depart-
ment on September 13, 1995.

A motion to suppress evidence was heard by *Catherine A.
White,* J., and the cases were tried before *Elizabeth Butler,* J.

*James F. McNiff, II,* for the defendant.

*Robert C. Cosgrove,* Assistant District Attorney, for the Com-
monwealth.

FRIED, J. The defendant, Robert F. Larkin, III, was convicted
of murder in the first degree, as well as aggravated rape and
unarmed robbery. We affirm the convictions and decline to
exercise our power under G. L. c. 278, § 33E, to order a new
trial or reduce the murder verdict.

I

On November 20, 1994, police recovered a body from a

submerged ledge on the face of the Granite Rail Quarry in Quincy. The body was wrapped in a blanket and was weighted down with cinder blocks. Removal of the blanket revealed the body of a young woman, bound and gagged, in torn clothing. An autopsy determined that the woman, identified as Sonia Leal, had died of asphyxia, either as a result of the gag or of tape found wrapped tightly around her neck.

The defendant was first interviewed regarding his possible connection with Leal's murder on March 15, 1995. He had been arrested earlier that day on an outstanding probation surrender warrant. The defendant was taken to the Norfolk County district attorney's office by State police Sergeant Joseph Flaherty. He was advised of his Miranda rights and he waived those rights by signing, after reading, the Miranda card in the presence of Sergeant Flaherty and Troopers Kevin Shea and Gerald Mattaliano.[1] The defendant was then questioned by Sergeant Flaherty, who took notes of the interview on a laptop computer. After approximately one hour he asked permission to call his family at home and was permitted to do so. The interview revealed nothing incriminating. At the conclusion of the interview, the officers completed the booking process and the defendant was transported to the Norfolk County house of correction.

On March 22, 1995, the defendant was once again interviewed by Sergeant Flaherty and Trooper Shea in connection with the Leal murder. The defendant, who was still at the Norfolk County house of correction, was brought down to an interview room and signed a waiver indicating his willingness to speak with the troopers. Once the waiver was signed, Trooper Shea read the defendant his Miranda rights and he again signed a Miranda card. The defendant was then questioned for approximately one hour and fifteen minutes, during which time he admitted that, at some time during November, 1995, he had assaulted and robbed a prostitute. He contended that the woman then fled and he denied any involvement in the murder of Leal. During the interview Trooper Shea took handwritten notes.

On July 21, 1995, Sergeant Flaherty received information from the Federal Bureau of Investigation that a fingerprint recovered from the tape wrapped around Leal's mouth had been positively identified as that of the defendant. The troopers then

---

[1] The defendant had, in the past, been arrested and informed of his Miranda rights.

obtained an arrest warrant and returned to the house of correction to speak to the defendant.

The defendant was brought to the office of correction officer Dennis F. Casey. Casey told the defendant that the troopers were there to talk to him. The defendant expressed reservations about speaking with the troopers and Casey explained to him that he did not have to see the troopers and could return to his cell block without talking to them. He told the defendant that, if he wanted to speak with the troopers, he could do so on signing a law enforcement special agency waiver form. The defendant then indicated to Casey that he wished to speak to the troopers.

The defendant was brought into the interview room where he reviewed and signed the waiver in the presence of Casey and Sergeant Flaherty and Trooper Shea. Casey indicated to the defendant that, should he wish to terminate the interview and return to his cell, he could do so by signaling the officer, whose desk was directly across from the interview room visible from where the defendant was sitting.

Before advising the defendant of his Miranda rights, the troopers and the defendant engaged in a conversation which lasted approximately ten minutes. The defendant indicated his displeasure that he had been denied parole several times and indicated that he was due to be released soon. Flaherty told the defendant that he should be more concerned about ever getting out of prison, and that an arrest warrant had been issued charging him with the murder of Leal. Flaherty explained to the defendant that the authorities were in possession of indisputable evidence that would link him to the Leal murder. Flaherty refused to disclose the nature of the evidence but told the defendant that if he decided to give a statement regarding what happened the night of Leal's death, Flaherty would reveal the evidence at the conclusion of the statement.

The defendant asked the troopers if he would go to jail even if he made a statement. Flaherty indicated that he likely would. The defendant asked if he would still be charged with murder, even if he made a statement. Flaherty again responded in the affirmative. The defendant then asked about the different degrees of murder. Flaherty explained that, if the defendant were convicted of murder in the first degree, he would receive a sentence of life in prison without parole and if he were convicted of murder in the second degree, he could be eligible for parole after fifteen years. Flaherty also indicated that the

defendant could be convicted of manslaughter or be found not guilty of any of the aforementioned offenses but that, based on the evidence already in the possession of the law enforcement authorities, there was a strong likelihood that the defendant would be convicted of murder. Flaherty also indicated that this result would be affected by what any codefendants might say regarding the defendant's role in the murder, and that, although the defendant was the only one charged with Leal's murder so far, there were two others who would also likely be charged.

Flaherty then told the defendant that, although they could not promise him anything, if the defendant gave a statement and cooperated with the troopers, they would indicate this to the district attorney in charge of the case. The defendant said that he had small children and that he did not want them to have to visit him in jail, and he expressed concern that should he give a statement he would go to jail for the rest of his life. Flaherty told the defendant that he might want to do some soul-searching and make peace with himself or his God and get the matter off his chest by making a statement.

The defendant asked the troopers how he could make a statement without an attorney and Flaherty explained that the decision to speak with or without an attorney was the defendant's to make. Flaherty also explained that the right not to speak and to have an attorney present were among the defendant's rights, which, Flaherty indicated, they were about to read the defendant. Sergeant Flaherty told the defendant that he would have to waive these rights if he wished to give a statement to them and suggested that the defendant take a minute and decide if he wanted to go forward. After a few minutes, the defendant indicated that he wished to give a statement. At this point, approximately ten minutes after the start of the interview, at 9:12 P.M., Trooper Shea read the defendant his Miranda rights from a printed card. The defendant asked Flaherty if he was going to record the statement and Flaherty responded that he had a laptop computer on which he would take notes as the statement was made. The defendant then gave a highly incriminating statement regarding his involvement in the murder of Leal.[2]

The entire interview lasted approximately one and one-half

[2]The defendant indicated that, on or about November 15, 1994, he and Shawn Kane had gone to the Combat Zone section of Boston to pick up a prostitute. He indicated that they had difficulty getting any prostitute to enter the car because the prostitutes had a safety concern about getting into a car

hours and consisted of statements given by the defendant and answers to questions asked by Flaherty. At no time during the interview did the defendant signal to the correction officer outside that he wished to end the interview nor did he express to the troopers in the room that he wanted to stop talking. The defendant did not request an attorney nor did he ask to make a telephone call.

At the conclusion of the interview, Flaherty told the defendant that they had recovered a fingerprint from the tape around the victim's mouth and that the fingerprint matched that of the defendant. The troopers again advised the defendant that there was a warrant in effect for his arrest and that he was to be charged with the murder of Leal.

The defendant was indicted for Leal's murder, aggravated rape, and unarmed robbery. The defendant filed a motion to suppress the statements he made to the police on March 15, March 22, and July 21, 1995. A judge in the Superior Court denied the motion. The defendant was tried and was convicted by a jury on all three charges. He was convicted of murder in the first degree by reason of extreme atrocity or cruelty and felony-murder.

---

with two men. They therefore decided to have Kane hide in the back of the car so that the women would see only one person in the car. The defendant then picked up the victim, Leal, who agreed to accompany him home in exchange for one hundred dollars. Once there, the defendant gave the victim seventy-five dollars and they went to the defendant's bedroom where the victim performed oral sex on the defendant and had intercourse with him.

When the victim emerged from the bedroom, Kane, who had hidden in the car, and a third individual, Kevin Lynch, were present. One of these individuals requested sex but the victim refused because the individual indicated that he had no money. An argument ensued and, as the victim headed for the door, the defendant grabbed her purse and the three men beat her. Once the victim was unconscious, the men got some rope and tied her hands and legs and put tape over her mouth. They then dragged her into the back bedroom where one of the other men had sex with her. When this man was done, the third individual went into the room and also had sex with the victim. When this third man emerged, according to the defendant, he announced that he did not think that the victim was breathing. Once this was verified, the three wrapped the body in a bedspread. After spending the next day drinking heavily, they decided to weigh the body down with cinder blocks and dump it in the quarry.

Kevin Lynch was convicted of murder in the first degree. That judgment was affirmed. See *Commonwealth* v. *Lynch*, 428 Mass. 617 (1999). Shawn Kane was awaiting trial on Leal's murder as of January, 1999.

## II

The motion judge denied the defendant's motion to suppress the July 21 statement for two reasons: that the defendant, although incarcerated, was not the subject of custodial interrogation, and that in any event the defendant had not been subjected to interrogation prior to receiving Miranda warnings. On appeal the defendant argues that the motion judge erred in denying the motion to suppress his July 21, 1995, statement to the police.[3] He argues that the police improperly failed to give Miranda warnings and that his admissions were involuntary. The motion judge was correct in ruling that the interrogation was not custodial for purposes of Miranda. The judge was wrong to rule that it was clear that there had been no interrogation prior to the administration of the warnings,[4] but the statements are admissible on the affirmative ground, urged by the Commonwealth here and pressed on the motion to suppress below,

---

[3]The defendant does not, on appeal, challenge the admission of the statements of March 15 or March 22, 1995.

[4]Although the Supreme Court of the United States has defined interrogation as "express questioning or its functional equivalent," *Rhode Island* v. *Innis*, 446 U.S. 291, 300-301 (1980), the term "functional equivalent" has been construed quite broadly. It has been defined as "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect," *id.* at 301, including "psychological ploys" likely to elicit such a response. *Arizona* v. *Mauro*, 481 U.S. 520, 526 (1987). Here the officers both told the defendant that they possessed incontrovertible evidence of his involvement in the crime and offered to bring any cooperation on his part to the attention of the district attorney. They also told the defendant that he might wish to do some "soul-searching" or make peace with himself or his God by getting the matter off of his chest. Such actions have been held "likely to elicit an incriminating response." See, e.g., *United States* v. *Montana*, 958 F.2d 516, 518 (2d Cir. 1992) (functional equivalent of interrogation to tell suspect that any cooperation would be brought to attention of assistant United States attorney); *United States* v. *Gomez*, 927 F.2d 1530, 1538-1539 (11th Cir. 1991) (information concerning harshness of sentences and benefits of cooperation are precisely the type of psychological ploy *Innis* and *Miranda* sought to prevent because they are likely to be interpreted by accused as pressure to respond and come clean); *Toliver* v. *Gathright*, 501 F. Supp. 148 (E.D. Va. 1980) (confronting an accused with incriminating evidence against him is a common and traditional method of prompting a recalcitrant witness to confess); *State* v. *Koltay*, 659 So. 2d 1224, 1225-1226 (Fla. Dist. Ct. App. 1995) (faced with statement indicating that police already believe him to be guilty, suspect likely to determine that he has nothing to lose by making a statement or may believe his silence will condemn him); *Alford* v. *State*, 699 N.E.2d 247, 250 (Ind. 1998) (confronting suspect with potentially incriminating evidence was "inter-

that the defendant had made no incriminating statements — had not "let the cat out of the bag" — in the ten minutes before the warnings were administered.

## A

Miranda warnings are only necessary where one is the subject of "custody and official interrogation." *Illinois* v. *Perkins*, 496 U.S. 292, 297 (1990) (Miranda warnings only required when a suspect is both in custody and subject to state interrogation because "[i]t is the premise of *Miranda* that the danger of coercion results from the interaction of custody and official interrogation"). See *Miranda* v. *Arizona*, 384 U.S. 436, 444 (1966); *Commonwealth* v. *Morse*, 427 Mass. 117, 122-123 (1998); *Commonwealth* v. *Jung*, 420 Mass. 675, 688 (1995). Whether a suspect was subject to custodial interrogation is a question of Federal constitutional law. *Morse, supra* at 123. *Commonwealth* v. *Snyder*, 413 Mass. 521, 531 (1992). The defendant bears the burden of proving custody. *United States* v. *Charles*, 738 F.2d 686, 692 (5th Cir. 1984). The test is an objective one: whether a reasonable person in the suspect's shoes would experience the environment in which the interrogation took place as coercive. See *Stansbury* v. *California*, 511 U.S. 318, 323 (1994) ("the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned"); *Morse, supra* at 123-124.

Whether a person was in custody for the purposes of the Miranda rule has been a much litigated and troublesome question. Usually the issue has revolved around whether a person invited to the police station to answer questions[5] or whether one interviewed away from a police station, but in a more or less

rogation" as it had no apparent purpose other than inducing suspect to say something inculpatory).

[5]See, e.g., *California* v. *Beheler*, 463 U.S. 1121, 1125 (1983) ("*Miranda* warnings are not required 'simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect' "), quoting *Oregon* v. *Mathiason*, 429 U.S. 492, 495 (1977); *Commonwealth* v. *Morse*, 427 Mass. 117, 127-128 (1998) (suspect who agreed to be questioned at police station not in custody for Miranda purposes); *Commonwealth* v. *Phinney*, 416 Mass. 364, 369-371 (1993) (suspect who voluntarily went to police station and was aware he was free to leave not in custody for Miranda purposes); *Commonwealth* v. *Gil*, 393 Mass. 204, 212 (1984) ("Although we recognize that 'an interview at [a police station or at another]

impressive police presence, should be considered in custody so that Miranda warnings are a precondition of questioning. Compare *Berkemer* v. *McCarty*, 468 U.S. 420, 437-438 (1984) (roadside questioning not custodial because it is presumptively temporary and brief and takes place in public), and *Sprosty* v. *Buchler*, 79 F.3d 635, 641 (7th Cir.), cert. denied, 519 U.S. 854 (1996) (finding of custody less likely if confronted by only one or two officers), with *Orozco* v. *Texas*, 394 U.S. 324, 324-325 (1969) (defendant confronted in his bedroom by four police officers was in custody), and *Commonwealth* v. *Alicea*, 428 Mass. 711, 714-715 (1999) (suspect, questioned regarding murder of his children at his apartment, then agreed to accompany police to cemetery where he indicated he had heard that their bodies were buried, not in custody).

It might seem, therefore, that this is an easy case: there is no nice legal issue about whether the defendant was actually under arrest, whether he thought he was, or whether a reasonable person in his situation would have thought so. He was, after all, incarcerated at the time, and it is hard to be more in custody than that. And yet the motion judge was correct to rule that the defendant was not in custody for Miranda purposes at the time of the interview.

The Miranda rule is not a legislative mandate, whose plain meaning must be followed even where the result in a particular case may seem unreasonable; it is a judicial exposition of what the Supreme Court has concluded is an implication or implementation of the constitutional privilege against self-incrimination. *Miranda, supra* at 490-491 (Miranda warnings are a judicial creation, "the Constitution does not require any specific code of procedures for protecting the privilege against self-incrimination during custodial interrogation"). *Miranda* states a principle, and it is the principle to which we must look in determining *Miranda*'s proper range. *Miranda* itself states the principle: custodial interrogation raises sufficient concerns that it is coercive because during such interrogation the subject is likely to feel so wholly in the power of the police, isolated, not free to go or to terminate the interview unless he gives the police what they want, that, in such conditions of isolation and powerlessness the required readings are necessary to assume the voluntariness of any

---

official place intimates a degree of coercion, . . . it does not, in itself, brand an interrogation as custodial' "), quoting *Commonwealth* v. *Bookman*, 386 Mass. 657, 660 (1982).

incriminating statements. See *Miranda, supra* at 461. The question, therefore, is not whether a person is in custody in some abstract sense or for some other purpose, but whether he is in custody in the sense that implicates the concerns motivating the *Miranda* rule in the first place.

Numerous courts have acknowledged that the usual test for determining if a person is in custody when questioned — whether there was a restraint on the defendant's freedom of movement of the degree associated with formal arrest — is not particularly apposite in considering the question of prison inmates. See *United States* v. *Conley,* 779 F.2d 970, 973 (4th Cir. 1985), cert. denied, 479 U.S. 830 (1986); *Bradley* v. *State,* 473 N.W.2d 224, 228 (Iowa Ct. App. 1991); *People* v. *Margolies,* 125 Misc. 2d 1033, 1042 (N.Y. Sup. Ct. 1984). In fact, literal application of the "free to leave" standard to inmates "would not only be inconsistent with *Miranda* but would torture it to the illogical position of providing greater protection to a prisoner than to his nonimprisoned counterpart." *Cervantes* v. *Walker,* 589 F.2d 424, 427 (9th Cir. 1978). See *United States* v. *Menzer,* 29 F.3d 1223, 1231-1232 (7th Cir.), cert. denied, 513 U.S. 1002 (1994); *United States* v. *Cofield,* 960 F.2d 150 (6th Cir.), cert. denied, 506 U.S. 1023 (1992); *United States* v. *Conley, supra* at 973. Thus, in such circumstances, rather than asking whether a prisoner was free to leave the facility, courts have asked whether he is subject to some restraint in addition to those normally imposed on him by virtue of his status as an inmate. See *United States* v. *Willoughby,* 860 F.2d 15, 24 (2d Cir. 1988), cert. denied, 488 U.S. 1033 (1989) (there must be some "measure of compulsion above and beyond that confinement" or a change in surroundings of the prisoner which results in an added imposition of his freedom of movement); *Leviston* v. *Black,* 843 F.2d 302, 304 (8th Cir.), cert. denied, 488 U.S. 865 (1988) (there must be "some restriction on [the inmate's] freedom of action in connection with the interrogation itself"); *State* v. *Conley,* 574 N.W.2d 569, 573-574 (N.D. 1998) ("Incarceration does not automatically make an inmate in custody for *Miranda* purposes. Some added restriction on the inmate's freedom of movement during the interrogation itself must exist. . . . If a prisoner makes a challenged statement when he was not subjected to more than the usual restraint on a prisoner's freedom of movement, the prisoner is not in custody and *Miranda* warnings are not required"); *State* v. *Warner,* 125

Wash. 2d 876, 885 (1995) ("When dealing with a person already incarcerated, 'custodial' means more than just the normal restrictions on freedom incident to incarceration").

An additional restraint is one that places a restriction on the inmate's freedom of action in connection with the interrogation and prevents him from leaving the scene of questioning by placing a further limit on his already restricted freedom of movement. See *Willoughby, supra* at 24; *Leviston, supra* at 304. The precise question is thus "whether the prisoner would reasonably believe himself to be in custody beyond that imposed by the confines of ordinary prison life." *Margolies, supra* at 1041. See *United States* v. *Conley, supra* at 973; *Cervantes, supra* at 428. This determination requires an assessment of the totality of the circumstances surrounding the alleged interrogation. *Garcia* v. *Singletary*, 13 F.3d 1487, 1492 (11th Cir.), cert. denied, 513 U.S. 908 (1994).

In this case it is as clear as can be that the circumstances of the interview were in the special Miranda sense noncustodial. Though the defendant was certainly in custody in the sense that he was not free to walk off the correctional institution's premises, he was not at all in the control of the troopers who were interrogating him, and indeed everything had been done to make it quite clear to him that he held the reins of the encounter. First of all, he had been told that he did not have to meet with the troopers at all. Then he met with them apart from his usual place of confinement, in a lawyer's interview room.[6] And finally he had been told by Officer Casey, who was part of the correctional, not the interrogating, staff,[7] that he could end the

---

[6]Courts have uniformly found that such a setting militates against a finding of custody. If anything, movement from his cell block to this more open part of the facility increased the defendant's sense of freedom from confinement. See *United States* v. *Menzer*, 29 F.3d 1223, 1232-1233 (7th Cir.), cert. denied, 513 U.S. 1002 (1994) (interview room); *United States* v. *Cofield*, 960 F.2d 150 (6th Cir.), cert. denied, 506 U.S. 1023 (1992) (assistant warden's room); *Leviston* v. *Black*, 843 F.2d 302, 304 (8th Cir.), cert. denied, 488 U.S. 865 (1988) (interview room); *United States* v. *Cooper*, 800 F.2d 412, 414 (4th Cir. 1986) (conference room); *Flittie* v. *Solem*, 775 F.2d 933, 944 (8th Cir. 1985) (en banc), cert. denied, 475 U.S. 1025 (1986) (visitors' room). See also *Commonwealth* v. *Cartegena*, 386 Mass. 285, 288 (1982) (proper for police to bring defendant into conference room to tell his story). Additionally, the situs of the interview militates against finding the situation coercive because the defendant was familiar with the setting, having previously been questioned by these troopers in the same room. Cf. *Commonwealth* v. *O'Toole*, 351 Mass. 627, 631 (1967).

[7]The fact that the questioners were outside visitors rather than correction

interview at any time merely by signaling Casey (who was directly across the hall and visible from where the defendant sat) and that if he did so the interview would be ended and he would immediately be returned to his cell.[8] Moreover, the discussion was of a relaxed tenor, with the defendant often controlling the direction of the conversation with his questions, and was not excessively lengthy. The defendant was not placed in any type of physical restraints.

## B

The defendant's statements in the July 21 interview were admissible on the alternative ground that he made no incriminating statements prior to the administration of the Miranda warnings. In the jargon peculiar to this corner of the law, he did not "let the cat out of the bag" prior to the Miranda warnings, although he surely did afterward. See *Commonwealth* v. *Sarourt Nom*, 426 Mass. 152, 156 (1997); *Commonwealth* v. *Watkins*, 375 Mass. 472, 480-482 (1978). The motion judge did not reach this issue, but her findings of fact are sufficient to allow us to conclude that, as a matter of law, what the defendant said prior to the warnings was not inculpatory.

It has never been the law that once the police fail in their obligations under *Miranda* all subsequent uncounseled state-

---

personnel also points to a finding that the defendant was not in custody. *Cooper, supra* at 413-415. *State* v. *Owen*, 1 Neb. App. 1060, 1091 (1993), cert. dismissed, 513 U.S. 923 (1994).

[8]Courts have consistently found no custody where the inmate was told that the interview was voluntary and that he could end it at any time. See *Commonwealth* v. *Hine*, 393 Mass. 564, 565, 569 (1984); *Cofield, supra*; *Owen, supra* at 1090; *People* v. *Alls*, 83 N.Y.2d 94, 101-104 (1993), cert. denied, 511 U.S. 1090 (1994). See also *Commonwealth* v. *Phinney*, 416 Mass. 364, 370 (1993) (fact that suspect is free to terminate interview is strong evidence that questioning is noncustodial). Indeed, even absent explicit statements that the inmate was free to leave, an inmate could be found not to be in custody simply because he could have asked to do so. *Leviston, supra* at 309 n.3; *People* v. *Patterson*, 146 Ill. 2d 445, 453-455, cert. denied, 506 U.S. 838 (1992).

Here, the defendant was expressly told that he did not have to see the troopers and that he could return to his cell block without talking to them. The defendant understood this; in fact, on a previous occasion the defendant was presented with the same option — police officers had come to the house of correction and asked him to speak to them voluntarily. In that instance, the defendant declined and his wishes were honored. In this instance, after expressing reservations about speaking with the troopers, he ultimately decided to sign a waiver indicating that he wanted to speak with them.

ments by an accused must be excluded. The taint of a *Miranda* violation is not ineradicable. We have differed from the Supreme Court on this issue, but the difference is one of degree. In *Oregon* v. *Elstad*, 470 U.S. 298 (1985), the Court rejected the rule of presumptive taint. The rule of law established in *Elstad* is that "absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." *Id.* at 314. We have been more demanding. *Commonwealth* v. *Smith*, 412 Mass. 823, 836 (1992) (establishing Massachusetts rule that a statement made following a violation of a suspect's Miranda rights is presumptively tainted requiring that the prosecution show "more than the belated administration of Miranda warnings in order to dispel that taint"). According to our cases, the taint of an earlier Miranda violation may be removed if either (1) sufficient time has elapsed and there has been a sufficient break in the course of events to allow the conclusion that the taint has been dissipated, *Commonwealth* v. *Osachuk*, 418 Mass. 229, 231 (1994), *or* (2) the pre-Miranda interview led to no inculpatory statement. See *Sarourt Nom, supra* at 156; *Smith, supra* at 835-837; *Watkins, supra* at 482.[9]

In this case there was no break in the course of the interview, the Miranda warnings being issued some ten minutes after it began. The defendant admitted nothing in those ten minutes. Much of the conversation was taken up by the defendant's asking what his rights and liabilities might be. The troopers gave accurate answers, answers which enhanced rather than detracted from the sense of the seriousness of the situation in which the defendant found himself, and thus gave greater assurance that when he did waive his Miranda rights the defendant had a good understanding of what he was up against. This made the Miranda warnings, when given a few minutes later, if anything

---

[9]*Commonwealth* v. *Prater*, 420 Mass. 569, 580 n.10 (1995), should not be read to require that the Commonwealth, which bears the burden of proof on this matter, must demonstrate that *both* conditions have been met. Nothing in the opinion supports such a reading, and neither do the cases cited in the footnote. See *Commonwealth* v. *Smith*, 412 Mass. 823, 835-837 (1992); *Commonwealth* v. *Watkins*, 375 Mass. 472, 480-482 (1978).

more effective. In one part of the pre-Miranda exchange the defendant specifically asked if he might make a statement without his lawyer being present and the troopers answered correctly that the decision to speak without an attorney being present was completely up to him. This in fact is an anticipation of one of the crucial parts of the Miranda warning, and it would be grotesque if somehow giving this information out of the canonical sequence, colloquially, and not in the rote, mechanical manner in which the warning is usually administered, would somehow count against the admissibility of a subsequent statement.

## C

Apart from the claim as to the Miranda warnings, the defendant makes no colorable claim that his statement of July 21, 1995, was in any way involuntary. First, there is no evidence that the defendant was intoxicated, under the influence of narcotics, or otherwise disabled at any point in the process. The defendant was a veteran of the criminal process, having been read his Miranda warnings in excess of ten times (and waiving them in most of these instances) in connection with this and other crimes. Throughout the meeting, both during the initial phases and while giving his actual statement, the defendant spoke freely and was responsive, alert, and coherent. Upon completing his statement, the defendant informed the troopers that he had previously wanted to tell them the information he had just given them. The motion judge found that "[t]here was no credible evidence that the troopers were coercive or overbearing in the manner in which they conducted their questioning." The motion judge thus properly determined that the Commonwealth satisfied its burden of demonstrating beyond a reasonable doubt that the defendant's statements were voluntary. See *Commonwealth* v. *Williams*, 388 Mass. 846, 856 (1983); *Commonwealth* v. *Tavares*, 385 Mass. 140, 152, cert. denied, 457 U.S. 1137 (1982).[10]

---

[10]The motion judge was also correct in holding that the defendant's claim that his rights were violated because the troopers failed to videotape or tape record his statements is without merit. This court has twice considered imposing a rule requiring the taping of interrogations and twice declined to impose such a stringent rule. See *Commonwealth* v. *Diaz*, 422 Mass. 269 (1996); *Commonwealth* v. *Fryar*, 414 Mass. 732, 742 (1993), *S.C.*, 425 Mass. 237,

### III

The defendant asserts that the judge erred in using a blackboard during her jury instructions to set forth the elements of murder but not doing the same for the elements of manslaughter, aggravated rape, and unarmed robbery. The defendant does not claim that the judge's instructions were incorrect, rather, he claims that charting one set of elements and not others was "selective overemphasis." As we explained recently in *Commonwealth* v. *DiBenedetto*, 427 Mass. 414, 421-422 (1998), this does not constitute error. As we stated in that case, the judge is entitled to place the elements of the crime on the blackboard, *id.* at 422, and "reasonable steps to assist a jury in performing their function should be encouraged." *Id.* While the judge only charted the elements of one crime on the blackboard,[11] she told the jury on more than one occasion that all of her instructions were important and that any questions about them would be answered. Before proceeding to the specific instructions regarding the charges at issue, she instructed the jury that they should not consider anything "in the way I give these instructions as any evidence of my feelings about the case." She made clear that, in order to convict of any one of the offenses, the jury must find each element of the crime beyond a reasonable doubt. The jury proceeded to find the defendant guilty of not only murder in the first degree, but also the "uncharted" crimes of rape and unarmed robbery.

We have examined the entire record, as required by G. L. c. 278, § 33E, and conclude that there is no basis for ordering a new trial or directing the entry of a verdict of a lesser degree of guilt.

*Judgments affirmed.*

cert. denied, 522 U.S. 1033 (1997). We have stated, however, that defense counsel is entitled to pursue the failure of law enforcement officials to tape an interrogation, among other things, as a means of casting doubt upon the voluntariness of any statements made. *Diaz, supra* at 273. Defense counsel here availed himself of this opportunity. He cross-examined Sergeant Flaherty and Trooper Shea extensively as to their access to, and failure to use, a video recorder, tape recorder, or a stenographer. He argued extensively that the court should suppress the confession, in part due to the failure of the troopers to record it. The judge, presented with these arguments, was nonetheless within the discretion expressly granted by the decisions in *Diaz* and *Fryar* when she declined to suppress the statements.

[11]The judge charted the crime of murder in the first degree, explaining the element of malice and the theories of felony-murder and joint venture.