NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

21-P-291

COMMONWEALTH

vs.

GREGORY F. LANDRY.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

Following a trial in Superior Court, a jury convicted the defendant of one count of rape of a child, aggravated by more than a ten year age difference, G. L. c. 265, § 23A (b), and one count of indecent assault and battery on a person fourteen years or older, G. L. c. 265, § 13H.[1]  On appeal, the defendant argues that:  (1) the judge erred by admitting numerous Instagram direct messages under the first complaint doctrine; (2) there was insufficient evidence to sustain his conviction of indecent assault and battery; and (3) the judge erred in denying the

---

[1] The jury also found the defendant guilty of one count of rape of a child; the trial judge dismissed this conviction as merged with the aggravated rape of a child.  Prior to the jury's deliberation, the judge dismissed indictments alleging assault and battery and assault with intent to rape a child under sixteen years.  The judge also allowed the defendant's motion for a directed verdict on one charge of open and gross lewdness.

defendant's motion to suppress statements he made to law enforcement. We affirm.

Background. We summarize the facts the jury could have found. The defendant was a close friend of the victim's mother. The victim (who was fourteen years old) considered the defendant (who was forty-four years old) family, referring to him as "Uncle Greg."

On the night in question, the plan was for the victim to help the defendant with his children that evening, sleep over in the attic, and babysit the children the next day while the defendant was at work. After the defendant's children went to bed, the victim donned a bathing suit and went to the backyard, where she chatted with the defendant and a woman visiting with her two children. The visitors left and the victim got into the inflatable hot tub. The defendant was alternating between sitting in the hot tub and standing nearby to drink beer and smoke. He eventually turned on the hot tub's jets.

The turbulence of the jets caused the victim to slip under the surface; she began to choke on water and was unable to get herself back up. The defendant put his hands underneath the victim's armpits, picked her up, and put her over the side of the hot tub. He jokingly told her, "Don't make me give you mouth-to-mouth." As the victim continued to cough, her vision began to darken, and she fell unconscious.

2

The victim woke sometime later to the feeling of pressure on her shoulders and an "intense throbbing" pain. She realized that her bathing suit top was off and her bottoms were half way down. She was positioned on top of the defendant's lap, his hands pushing her body down by the shoulders, the defendant's swim trunks were gone, and the defendant's penis was inside her vagina.

The victim pushed the defendant off and shouted at him to get away from her. He released her and moved away, apologizing. The victim dressed hastily and jumped out of the hot tub, running inside the house and up to the attic. There, she changed out of her swim clothes and texted her mother "a bunch of crying emojis." Receiving no response, the victim began instant messaging her close school friend via Instagram's direct message feature.

The victim sent her first message to her friend, eighteen sad face emojis, at 11:10 P.M. The victim then wrote that "[a] lot" was wrong and she "want[ed] to die"; she declined her friend's offer to call because she was concerned that "[h]e" would hear their conversation. Her friend sent messages comforting her and coaxing her to tell him what happened. Their written conversation lasted through the night, including a lull during which the victim continued to send messages to her friend

3

while he was sleeping.  The conversation culminated in the victim disclosing, at approximately 8:52 A.M., "I got raped."

The victim remained in the attic throughout the night, except for a brief trip downstairs to check on her younger sister, who was sleeping outside the defendant's room.  The defendant repeatedly approached the bottom of the attic stairs and called up to the victim, telling her he was sorry and that he loved her.  The defendant also sent remorseful text messages expressing his love for the victim and hatred for himself; the victim responded with an accusation of rape, which he did not deny.[2]

---

[2] The defendant and the victim exchanged the following text messages starting at 5:37 A.M. the morning after the assault, which were read into evidence and some of which the defendant had deleted.

| | |
|---|---|
| Defendant: | "Sorry, sorry, sorry, infinity." |
| Victim: | "What you did was unforgivable." |
| Defendant: | "[N]ever again, I promise.  I love you [four heart emojis] . . . forever." |
| Victim: | "If you love me, you wouldn't have fucking raped me." |
| Defendant: | "No more hot tub with just us.  I need a kick in the jimmy." |
| Victim: | "You're not making this any better.  You're making this worse by talking to me when I do not wish to talk to you." |
| Defendant: | "Okay.  Sorry.  Bye." |

Several hours later, at approximately 9:20 A.M., the texting resumed.

| | |
|---|---|
| Defendant: | "Please kill me.  I feel awful." |
| Victim: | "YOU DIDN'T FEEL THAT WAY WHEN I WAS ASLEEP." |
| Defendant: | "Don't ever drink alcohol.  Kill me." |

4

Just after the text messaging between the victim and the defendant started, at around 5:30 A.M., the defendant left for work. The victim checked on the younger children, eventually feeding them breakfast, and then spoke with her mother. At around 8:30 or 9:00 A.M., before her mother got to the house, the defendant returned. The victim was in the attic, and the defendant attempted to hand her a "sword" and told her to stab him with it. The victim declined and instead told the defendant she was calling the police, which she did. The victim's mother arrived at the home. Subsequently, several officers responded to the defendant's address.[3]

Two officers went to the backyard, where the defendant was standing. His two children were outside as well. One officer approached the defendant, while the other stood back. The officer asked the defendant if he knew why the police were there. The defendant replied, "I may have inappropriately touched her." The officer ceased asking questions and went to confer with other officers.

Soon after this encounter, the defendant was handcuffed, placed in the backseat of a police cruiser, and advised of his

---

Defendant: "I hate every minute now because you hate me."

[3] The victim was eventually taken to the hospital. While there, the clothing she was wearing and the clothing she changed into after the incident were taken from her and examined. The defendant's DNA was not detected on the victim's underwear.

5

Miranda rights; the defendant stated that he understood his rights. The arresting officer then asked the defendant what he meant by his statement in the backyard and the defendant explained that he may have inappropriately touched the victim's breasts to keep her from drowning. He further stated that he may have removed her bathing suit top, once again asserting that he was trying to save her from drowning. He denied having intercourse with the victim.

Discussion. 1. First complaint evidence. The defendant contends that the motion and trial judges committed reversible error by admitting Instagram messages sent hours before the disclosure of sexual assault as first complaint evidence.[4] He argues that the statements exceeded the scope of the first complaint doctrine and impermissibly prejudiced the defense.

We review the judge's decision to admit the messages as first complaint evidence under an abuse of discretion standard. Commonwealth v. Holguin, 101 Mass. App. Ct. 337, 340 (2022). Because the defendant made a timely objection, we will determine

---

[4] Prior to trial, the defendant moved in limine to limit the scope of first complaint evidence to the single Instagram message stating, "I got raped." The motion judge ruled that the twenty-nine pages of messages preceding this disclosure were part of the first complaint and, as such, admitted the entire conversation from 11:10 P.M. to 8:52 A.M. The judge excluded the fifteen pages of text that followed it. The defendant raised the issue again during trial. The trial judge allowed one additional redaction but otherwise agreed with and followed that motion judge's ruling.

if there was error, and if so, whether it was prejudicial. Commonwealth v. Aviles, 461 Mass. 60, 72 (2011). We conclude that the judge acted within his discretion.

Pursuant to the first complaint doctrine, "the recipient of a [victim's] first complaint of an alleged sexual assault may testify about the fact of the first complaint and the circumstances surrounding the making of that first complaint." Commonwealth v. King, 445 Mass. 217, 218-219 (2005). A first complaint witness may testify to "the details of the complaint itself," including "the [victim's] statements of the facts of the assault" (citation omitted). Id. at 244. The details of the first complaint may also include "why the complaint was made at that particular time." Id. at 245.

Here, the messages from the victim to her friend "were part of a single, continuous first complaint."[5] Holguin, 101 Mass. App. Ct. at 340. That the exchange of messages paused while the victim's friend fell asleep does not preclude the admission of the whole conversation as a first complaint. Where a disclosure is made in stages over an extended period, it may nevertheless constitute a single first complaint where it consists of a "single, tightly intertwined . . . communication," with "no

---

[5] The messages spanned twenty-nine screenshots because only seven to ten messages were displayed per screen. When typed, the conversation was eight pages.

7

meaningful gap in time."  Commonwealth v. Revells, 78 Mass. App. Ct. 492, 496 (2010).  Here, although the conversation occurred over the course of approximately nine hours overnight wherein the recipient slept for approximately five hours, the victim wanted to and tried to remain in contact with her friend throughout the evening, and the communications were made to the same recipient and concerned the same crime.  See Holguin, supra at 340-341.  Thus, notwithstanding the gap while the victim's friend slept, their "successive communications" were "part of 'a single, tightly intertwined . . . communication.'"  Id. at 340, quoting Revells, supra.  Contrast Commonwealth v. Rivera, 83 Mass. App. Ct. 581, 585 n.4 (2013) (one week gap in time between conversations rendered communications distinct).  The message that the victim had been raped was the natural continuation of the conversation, rather than a "[r]epetition of the narrative." Commonwealth v. Stuckich, 450 Mass. 449, 457 (2008).[6]  We therefore discern no abuse of discretion in the judge's decision

---

[6] In addition, the dozens of messages exchanged between the victim and her friend provided vital context of the circumstances under which the victim ultimately disclosed that she was raped.  Accordingly, the messages leading up to the message, "I got raped," were properly introduced "to give the jury as complete a picture as possible of how the accusation of sexual assault first arose."  King, 445 Mass. at 247.  See Revells, 78 Mass. App. Ct. at 495 (oral and written communications properly introduced as single first complaint to allow "a fuller assessment of the victim's veracity").

to admit the messages preceding disclosure as first complaint evidence.

2. Sufficiency of the evidence.  "To prove indecent assault and battery on a person age fourteen or older, the Commonwealth is required to establish that the defendant committed 'an intentional, unprivileged, and indecent touching of the victim.'"  Commonwealth v. Benedito, 95 Mass. App. Ct. 548, 549 (2019), quoting Commonwealth v. Kennedy, 478 Mass. 804, 810 (2018).  At trial, the Commonwealth argued, and the jury were instructed, that the basis of the indecent assault and battery charge was the touching of the victim's breasts.  The defendant argues that there was insufficient evidence that he touched the victim's breasts and therefore that the trial judge erred in denying his motions for a required finding of not guilty.[7]  We disagree.

When evaluating a claim of insufficiency of the evidence, we consider "whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a

_____

[7] The defendant moved for a required finding of not guilty on the indecent assault and battery count both at the close of the Commonwealth's case-in-chief and at the close of all evidence. Both motions were denied.  Since the Commonwealth's position as to proof did not change with the presentation of the defendant's case, the analysis of both motions is the same.  Commonwealth v. Kelley, 370 Mass. 147, 150 n.1 (1976).

9

reasonable doubt."  Commonwealth v. Latimore, 378 Mass. 671, 677 (1979), quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979). "Questions of credibility are to be resolved in the Commonwealth's favor, and circumstantial evidence is sufficient to establish guilt beyond a reasonable doubt."  Commonwealth v. Miranda, 458 Mass. 100, 113 (2010).

Here, in the light most favorable to the Commonwealth, the evidence was sufficient to demonstrate that the defendant committed an indecent assault and battery by touching the unconscious victim's breasts.[8]  The defendant admitted that he removed the bathing suit top of an unconscious teenage girl and the victim confirmed her top was removed when she was unconscious.  Further, the defendant told the victim, "Don't make me give you mouth-to-mouth" before she passed out, and when the victim regained consciousness, she was being raped by the defendant.  In addition, one of the police officers testified that he observed an oval injury on the victim's shoulder "consistent with a bite mark, red in color."  There was a

---

[8] The Commonwealth may have taken on more of a burden than necessary by conceding it needed to prove that the defendant touched the victim's breasts.  This court has held that "in certain circumstances, removing a person's clothes may constitute indecent assault and battery."  Commonwealth v. Cruz, 93 Mass. App. Ct. 136, 140 (2018).  For example, in Commonwealth v. Kopsala, 58 Mass. App. Ct. 387, 393 (2003), we upheld a conviction of indecent assault and battery where the defendant "pulled up the victim's shirt, exposing her breasts, unbuttoned her jeans and pulled them off, and removed her panties."

thirty-year age gap between the victim and the defendant, and the defendant was in a position of trust and authority with the victim.  Commonwealth v. Castillo, 55 Mass. App. Ct. 563, 566-567 (2002) (in evaluating whether touching is indecent, our cases have considered disparity in age and sophistication between victim and defendant, among other things).  Despite the defendant's assertion that his touching of the victim's breasts and removal of her top were accidental and necessary to save her from drowning, the jury could have reasonably discredited this assertion and inferred that the defendant removed the victim's top for the purpose of indecently revealing and touching her breasts.

3.  Motion to suppress.  The defendant asserts that the motion judge erred in denying his motion to suppress statements he made to police the morning after the assault.  He argues that, at the time he told police he "may have inappropriately touched [the victim]," he was in the functional equivalent of custody and thus entitled to Miranda protections.[9]  The defendant further argues that statements he made after being arrested and

_____

[9] "Miranda warnings seek to protect an individual's 'fundamental' right under the Fifth Amendment to the United States Constitution that '[n]o person . . . shall be compelled in any criminal case to be a witness against himself.'"  Commonwealth v. Cawthron, 479 Mass. 612, 616 (2018), quoting Miranda v. Arizona, 384 U.S. 436, 468 (1966).

11

given Miranda warnings were inadmissible as fruit of the poisonous tree.

In "reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error 'but conduct an independent review of [their] ultimate findings and conclusions of law.'" Commonwealth v. Clarke, 461 Mass. 336, 340 (2012), quoting Commonwealth v. Scott, 440 Mass. 642, 646 (2004). "Miranda warnings are only necessary where one is the subject of 'custody and official interrogation.'" Commonwealth v. Larkin, 429 Mass. 426, 432 (1999), quoting Illinois v. Perkins, 496 U.S. 292, 297 (1990). It is the defendant's burden to establish the necessary facts to prove custody. Larkin, supra.

The evidence at the suppression hearing established that the defendant was not in custody when he told police he may have inappropriately touched the victim. See Commonwealth v. Groome, 435 Mass. 201, 211-212 (2001) (factors relevant to custody include [1] place of interrogation; [2] whether officers conveyed to defendant any belief or opinion that defendant is suspect; [3] nature of interrogation; and [4] whether, at time statement was made, defendant was free to end interview, as evidenced by whether interview terminated with arrest). The defendant made the statement while standing in his own backyard, a "neutral site" with which he was familiar. Commonwealth v.

12

Lavendier, 79 Mass. App. Ct. 501, 504 (2011). Neither of the officers present stated to the defendant that he was a suspect, and the singular question asked was "investigatory rather than accusatory." Commonwealth v. Kirwan, 448 Mass. 304, 311 (2007). The nature of the questioning was not aggressive, consisting only of a brief, conversational exchange in which the defendant was neither restrained nor threatened. See Commonwealth v. Bryant, 390 Mass. 729, 737-738 (1984). Finally, although the interaction culminated in the defendant's arrest, this was only after the questioning officer conferred with his colleagues and learned more of the defendant's role in the alleged crimes. At the time the defendant made his statement, the officers had given no indication by word or action that he was not free to leave. See Commonwealth v. Medina, 485 Mass. 296, 304 (2020). The defendant was not in custody when he spoke to police in his backyard, and his fruit of the poisonous tree argument withers accordingly. Thus, the motion judge did not err in denying the

defendant's motion to suppress.

Judgments affirmed.

By the Court (Henry, Shin &
  Hodgens, JJ.[10]),

*Joseph F. Stanton*

Clerk

Entered:   July 24, 2023.

---

[10] The panelists are listed in order of seniority.

14