## Commonwealth *vs.* Carl Girouard, Sr.

Hampden. March 8, 2002. - May 1, 2002.

Present: Marshall, C.J., Greaney, Ireland, Sosman, & Cordy, JJ.

*Evidence,* Admissions and confessions, Voluntariness of statement, Expert opinion. *Constitutional Law,* Admissions and confessions. *Practice, Criminal,* Admissions and confessions, Voluntariness of statement, Conduct of prosecutor, Capital case.

At a pretrial evidentiary hearing on the issue whether a criminal defendant's statement to police officers was obtained in violation of his Miranda rights and was involuntary, the judge correctly concluded that the defendant's request for an attorney was not unambiguous or unequivocal but, rather, qualified on a circumstance that had not occurred, namely, his arrest; further, evidence presented at trial that a "psychological disability" rendered his statement involuntary was undercut by evidence that supported the Commonwealth's claim that the statement was the product of a rational mind, made voluntarily, and the issue was properly left for the jury's determination. [665-667]

This court rejected the contention of a criminal defendant that three alleged acts of prosecutorial misconduct during the course of a murder trial, considered as a whole, rose to the level of prejudicial error warranting relief. [667-669]

At a murder trial, the judge did not err in admitting expert opinion evidence of an analyst from a laboratory that performed deoxyribonucleic acid testing on sperm found inside the victim's body, where the expert's testimony did not touch on the ultimate issue in the case, and where the expert did not offer an opinion as to the defendant's guilt or innocence. [669-670]

Indictment found and returned in the Superior Court Department on December 2, 1998.

The case was tried before *C. Brian McDonald*, J.

*James L. Sultan* for the defendant.

*Katherine E. McMahon*, Assistant District Attorney, for the Commonwealth.

Greaney, J. The victim in this case was brutally stabbed to death in August, 1988. Although the defendant was a suspect in the killing, he was not charged with the victim's murder until

December, 1998. Thereafter, a jury in the Superior Court convicted him of murder in the first degree by reason of extreme atrocity or cruelty. In returning their verdict, the jury credited the Commonwealth's evidence, consisting of the defendant's incriminating statements, deoxyribonucleic acid (DNA) test results, and other evidence that linked him to the homicide, and they rejected the defendant's contentions that the statement he made to police officers in July, 1998, was involuntary, and that he could not have been the killer because he is right-handed and the stab wounds had been inflicted on the victim by a left-handed person. Represented by new counsel on appeal, the defendant argues that we should order a new trial because (1) his statement made to police officers in July, 1998, was obtained in violation of his Miranda rights and was involuntary, and, therefore, should not have been admitted in evidence; (2) the prosecutor engaged in prejudicial acts of misconduct; and (3) opinion testimony concerning the DNA testing was improperly placed before the jury. We reject the defendant's arguments. We also conclude that there is no basis to exercise our authority under G. L. c. 278, § 33E, to reduce the conviction to a lesser degree of guilt or to order a new trial. Accordingly, we affirm the conviction.

1. The defendant's trial counsel did not file a formal motion to suppress the defendant's July, 1998, statement. Rather, the prosecutor brought to the judge's attention that there might be an issue concerning the statement's admissibility, and the judge, over the objection of the defendant's trial counsel,[1] decided, as matter of discretion, to conduct a pretrial evidentiary hearing on

---

[1] Although the defendant's trial counsel admitted that he intended to challenge the voluntariness of the defendant's July, 1998, statement, he objected to a pretrial evidentiary hearing on the issue of voluntariness because he did not want to give the prosecutor an opportunity "prior to the beginning of the trial to discover what [his] expert's testimony [would] be." He apparently wanted to leave the issue of voluntariness for the jury's consideration. After the judge decided to conduct a pretrial evidentiary hearing on the issue, the defendant's trial counsel called only one witness to testify, State Trooper William Loiselle. At trial, however, the defendant's trial counsel called his expert to testify. In the absence of any evidence of involuntariness, which was the situation in this case prior to trial, the judge was under no obligation to conduct a pretrial evidentiary hearing. See *Commonwealth* v. *Benoit*, 410 Mass. 506, 511 (1991) (voir dire on voluntariness of statement not required unless defendant first raises issue of voluntariness of admission or confes-

the issue.[2] The judge concluded that the defendant's statement had been lawfully obtained and was voluntarily made, and the statement was later admitted at trial. The defendant's appellate counsel now contends that the judge erred in concluding that the interrogation of the defendant was noncustodial, and erred in admitting statements made by the defendant after he had invoked his right to counsel, and, alternatively, that the judge erred in admitting the defendant's statement because it was involuntary. To understand the present challenges, it is necessary to set forth what occurred after the murder in 1988, the evidence at the pretrial evidentiary hearing, the contention made by the defendant's trial counsel, and the judge's conclusions of law.

(a) From the Commonwealth's evidence at trial, the jury could have found the following. At about 7:30 P.M. on August 13, 1988, a man traveling with his father discovered the victim's body in the woods at a rest stop located near the Westfield-Holyoke line. The victim was naked, bruised, and had been repeatedly stabbed.

The victim was last seen with the defendant during the early morning of the day her body was found. The night before, at approximately 11:30 P.M., the victim was seen hitchhiking from downtown Westfield, seeking a ride to Holyoke. The defendant picked her up. At about midnight, they went to Foxy's Tea Room in Westfield, and had a couple of drinks. The defendant was wearing a belt with a knife holder. He left with the victim about one-half hour after they had arrived. The victim was never seen alive again.

State and local police processed the murder scene. The victim's shirt, shorts and underpants were recovered near her body. Her clothing was sent to the State police crime laboratory. Initial testing (not DNA testing) of the victim's underwear for sperm was inconclusive, but sperm cells were detected in her vagina.

---

sion); *Commonwealth* v. *Cartagena*, 386 Mass. 285, 287 (1982) (burden rests on defense counsel timely to raise issue of voluntariness before voir dire required).

[2]The judge who conducted the pretrial evidentiary hearing was also the trial judge.

An autopsy of the victim's body was conducted at 6 A.M. on August 14, 1988. The medical examiner concluded that the victim died sometime between twelve to forty-eight hours prior to the autopsy. He noted abrasions, scratches, and bruises on the victim's body. He also noted marks consistent with blunt trauma injury or defensive wounds. He concluded that the victim had died from multiple stab wounds to her neck, chest, abdomen and back. She had been stabbed thirteen times, and had been alive when the majority of these wounds were inflicted.

The investigation of the victim's death centered on the defendant. State police obtained warrants to search his home and automobile. Testing revealed the presence of "occult"[3] blood on his car's steering wheel and gear shift.

A few days after the victim's death, Westfield police questioned the defendant. After talking to police, the defendant signed a typewritten statement, in which he stated that he saw the victim hitchhiking, picked her up, and dropped her off outside the 49er Lounge. He recounted that he then went to Foxy's Tea Room for a beer. When confronted with information that he had been observed at Foxy's Tea Room with the victim, the defendant changed his story, admitting that he took the victim to Foxy's Tea Room, but insisted that thereafter, he dropped her off outside the 49er Lounge.

On June 8, 1998, the defendant was taken into custody for a parole violation (on charges unrelated to the victim's murder), after a suicide threat. The next day, two State troopers met the defendant at the office of his parole officer. The defendant agreed to provide them with a blood sample, which was submitted to a laboratory for analysis.

The defendant's blood, together with a portion of the underwear and a vaginal swab from the victim, as well as the victim's blood, were subjected to DNA testing by an analyst at Cellmark Diagnostics laboratory. The analyst concluded, from examining DNA obtained from the sperm fraction on the underwear and on the vaginal swab, that the sperm had been contributed by different donors. She also concluded that the defendant could be excluded as the donor of the sperm on the

---

[3]"Occult" blood cannot be seen with the naked eye and cannot be analyzed further to detect blood type.

underwear, but could not be excluded as the donor of sperm on the vaginal swab.

After obtaining the results from the DNA testing, the police officers, on July 23, 1998, went to the Massachusetts Correctional Institute at Concord (MCI, Concord), where the defendant was being held, to interview him.

(b) The sole witness at the pretrial evidentiary hearing was State Trooper William Loiselle. Trooper Loiselle's testimony described the July 23, 1998, interview, and was credited by the judge. The testimony may be summarized as follows:

Trooper Loiselle was accompanied on the visit to MCI, Concord, by Detective Baron Maruca of the Holyoke police department. The defendant was being held with the general prison population and was not segregated in the prison's mental heath unit. The officers were not in uniform and met with the defendant in an office used by the prison's internal security investigatory unit. The room, approximately sixteen feet by ten feet, contained a round table, chairs and windows. When the defendant arrived, the officers introduced themselves, although the defendant had met Trooper Loiselle the month before when the defendant had provided Trooper Loiselle with a blood sample.

After an initial greeting during which the defendant stated that he was doing well, that things were "going good" at home, and that he was back together with his wife, Trooper Loiselle read the defendant his Miranda rights from a card. The defendant stated that he understood those rights, signed the card containing the Miranda warnings from which Trooper Loiselle had read, and replied affirmatively that he wished to speak with the officers.

The officers first questioned the defendant about his recent suicide attempt. Detective Maruca asked the defendant if he had been serious about harming himself, and the defendant replied that he had not been serious, and that he told his wife he was suicidal because such talk "pisses her off." The defendant's explanation was consistent with the information provided to them by the defendant's parole officer and other law enforcement officers: that the defendant had feigned his recent suicide attempt because he was upset after being served with divorce

papers. They also learned that after the alleged suicide attempt, the defendant had been released from a hospital where it had been determined that he was neither a threat to himself nor to others.

The officers then turned to the subject of the victim's murder in 1988, asking the defendant to review his 1988 statement to police. After doing so, the defendant said that it "sounded all right," and that he had nothing to add. Trooper Loiselle questioned the defendant about whether he had had sexual relations with the victim in August, 1988. The defendant repeatedly denied having any form of sexual contact with the victim. However, after learning from the officers that testing on his blood confirmed that his sperm was found inside the victim, the defendant admitted to having had intercourse with her. The defendant stated that he did not want his wife to discover that information.

The officers asked the defendant to recount his activities on August 12 and 13 of 1988. The defendant stated the following: after getting out of work on the evening of August 12, 1988, the defendant drank some beer and "did some cocaine." He then picked up the victim, who was hitchhiking, and drove to Foxy's Tea Room, where they each had a beer. They left Foxy's, returned to the defendant's car in the parking lot and had intercourse in the car. Afterward, the defendant dropped the victim off at the 49er Lounge and went home.

During further questioning, the defendant admitted that he had not dropped the victim off at the 49er Lounge, but had driven her to the rest area where her body was later found. Eventually, the defendant confessed to killing the victim, stating, "I did it. What do you want me to sign?" After his initial confession, the defendant started crying.

At a later point in the interview, the defendant asked the officers if he were under arrest. The officers replied that he was not. The defendant asked them what was going to happen to him. Trooper Loiselle said that the police would pass on the information from the interview to the district attorney's office. The defendant then stated, "If I am under arrest, I want an attorney." The officers stood up and began collecting their papers. Trooper Loiselle told the defendant that if he wanted

them to leave, they would do so. The defendant again asked if he was under arrest, and Trooper Loiselle told him that he was not. The defendant said, "I'll talk to you if I'm not under arrest," and the interview resumed.

Trooper Loiselle asked the defendant if he would provide a statement. The defendant agreed, and as the defendant spoke, Trooper Loiselle transcribed his statement. The defendant had stopped crying at this point, was looking at the officers when he spoke, and spoke coherently to them. In his statement, the defendant said that after leaving Foxy's Tea Room, he took the victim to the rest area and had consensual sex with her out in the woods. He admitted, "I had sex with her and then I blacked out. I don't know how many times I stabbed her. I did it, but I don't even remember doing it."

The defendant reviewed Trooper Loiselle's transcription of his statement, stated that it was true to the best of his knowledge, and signed it. Trooper Loiselle read the statement back to the defendant. Trooper Loiselle asked the defendant "if he was glad that he got this off his chest," and the defendant started crying. Detective Maruca later asked the defendant the same question and the defendant replied, "Yes." The detective asked the defendant if he felt like killing himself, and the defendant replied, "No." The officers left.

During the defendant's questioning, before he cried, the defendant was calm, looked at the officers when they spoke to him, and responded appropriately to their questions. During the interview, the officers did not physically intimidate, threaten, trick, or pressure him, and did not make any promises, assurances, or offers of inducements to him. The defendant was alert and did not appear to be impaired in any way.

(c) The defendant's trial counsel did not present any evidence at the pretrial hearing that the defendant's statement was involuntary due to a psychological impairment or disability. Rather, he purposefully reserved this evidence for trial and offered it through his expert witness who had performed a psychological evaluation of the defendant. At the pretrial hearing, the defendant's trial counsel argued to the judge that Trooper Loiselle's testimony raised a question concerning the voluntariness of the defendant's statement because his testimony

demonstrated that the defendant had been questioned after requesting a lawyer. The defendant's trial counsel also argued that the officers should have repeated the Miranda warnings to the defendant throughout their questioning, and that the officers · misrepresented to the defendant that he was not under arrest when in fact he was, and that that misrepresentation undercut the voluntariness of the defendant's statement. The defendant's trial counsel explained, "I am not making a Miranda claim. I never moved to suppress the statement, Judge. I'm merely asking you to consider whether some evidence has been adduced relative to the voluntariness of the statement."

(d) The judge construed trial counsel's argument as one raising solely the issue of the voluntariness of the defendant's statement. Citing *Commowealth* v. *Larkin*, 429 Mass. 426 (1999), the judge concluded that the defendant was not in custody, and, therefore, Miranda warnings did not need to be given. Consequently, he ruled, no duty to repeat the Miranda warnings would have arisen.

Alternatively, the judge concluded that, even if Miranda warnings were required, appropriate warnings were given by Trooper Loiselle, and the defendant made a knowing, intelligent and voluntary waiver of his Miranda rights beyond a reasonable doubt. Further, the judge concluded that the Miranda warnings did not have to be repeated; that the circumstances of the interview were not coercive and did not render the defendant's statement involuntary; that the defendant's remark, "If I am [under arrest], I want an attorney," was not an unambiguous exercise of his right to counsel; that the defendant initiated further conversation with his remark that he would talk to the officers if he was not under arrest; that Trooper Loiselle's statement ·that the defendant was not under arrest was a truthful statement and "was not a ploy"; and that the defendant was not under arrest. Last, the judge stated, "I find no evidence that [the defendant] suffered any mental condition which rendered his confessions involuntary. Trial counsel chose to suggest this issue without psychiatric testimony. Psychiatric testimony may be admissible at the trial addressed to the issue of the voluntariness of the statement." Trial counsel objected to the judge's admission of the statement.

The defendant's appellate counsel challenges the judge's conclusion that the defendant was not in custody when he was questioned at MCI, Concord. Recognizing that the decision in *Commonwealth* v. *Larkin, supra,* poses an obstacle to this contention, he asks that the *Larkin* decision be overruled. He further argues that the judge "erred in concluding that [the defendant] initiated further questioning after first mentioning his desire to speak with an attorney." Alternatively, the defendant's appellate counsel argues that the judge erred in admitting the defendant's statement because it was involuntary. In support of this argument, the defendant contends that the statement was involuntary because he provided the statement in the absence of counsel after having requested counsel, and because he possessed a "psychological disability."

We need not dwell extensively on the *Larkin* point. The *Larkin* decision represents the general rule that "Miranda warnings are only necessary where one is the subject of 'custody and official interrogation.' " *Commonwealth* v. *Larkin, supra* at 432, quoting *Illinois* v. *Perkins,* 496 U.S. 292, 297 (1990). The mere fact that a person is incarcerated does not automatically render that person "in custody" for Miranda purposes. *Commonwealth* v. *Larkin, supra* at 434-435, and cases cited. See also *United States* v. *Chamberlain,* 163 F.3d 499, 502 (8th Cir. 1998), and cases cited (stating that other Federal courts have similar rule that "[t]he mere fact of incarceration does not ipso facto render an interrogation custodial"). Rather, in such circumstances, it must be determined, from the totality of the circumstances, "whether the prisoner would reasonably believe himself to be in custody beyond that imposed by the confines of ordinary prison life." *Commonwealth* v. *Larkin, supra* at 435, quoting *People* v. *Margolies,* 125 Misc. 2d 1033, 1041 (N.Y. Sup. Ct. 1984). "The defendant bears the burden of proving custody." *Commonwealth* v. *Larkin, supra* at 432. The judge's finding, that the defendant was not in custody when questioned, is consistent with the *Larkin* decision and is supported by the record. See *Commonwealth* v. *Larkin, supra* at 435-436 & nn.6, 7. The defendant's arguments to the contrary, that he was in custody because, in contrast to *Larkin,* "there was no evidence that the defendant was told 'that he did not have to meet with

the troopers at all,' " and that there was no evidence that the defendant "could end the interview at any time by signaling a correction[] officer in sight at all times," ignore the fact that the defendant bears the burden to prove that he was in custody. The defendant did not proffer any evidence that he had been forced to meet with the officers, nor did he proffer any evidence that he was not able to end the interview. Nevertheless, the defendant's argument fails at its inception, because, even if we assume that the defendant was in custody when he was questioned, the judge expressly found, with support in the evidence, that Miranda warnings were given, understood by the defendant, and knowingly, intelligently, and voluntarily waived.

Although the defendant correctly notes that, in accordance with *Edwards* v. *Arizona*, 451 U.S. 477, 484-485 (1981), once an accused invokes the right to counsel, he cannot be "subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police," he overlooks the significance of the judge's finding, which was supported by the record, that the defendant never invoked the right to counsel, see *Commonwealth* v. *Mandile*, 397 Mass. 410, 412 (1986). "Invocation of the *Miranda* right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.' . . . But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning" (emphasis in original). *Commonwealth* v. *Judge*, 420 Mass. 433, 450 (1995), quoting *Davis* v. *United States*, 512 U.S. 452, 459 (1994). The judge correctly concluded that the defendant's request for an attorney was not unambiguous or unequivocal; rather, it was qualified on a circumstance that had not occurred, namely, his arrest. This determination obviates the need to address the defendant's arguments concerning whether he initiated further questioning by the police, and whether his statement was involuntary because it was obtained after he invoked the right to counsel.

As to the defendant's claim that his "psychological disability" rendered his statement involuntary, trial counsel did not present any such evidence at the pretrial evidentiary hearing. Rather, it was only during the defendant's presentation of his case at trial that he proffered evidence on this issue, namely, testimony from his expert witness who had performed a psychological evaluation of the defendant. Whether the defendant's "psychological disability" affected, or did not affect, the voluntariness of the July, 1998, statement, was properly left for the jury's determination. See *Commonwealth* v. *Tavares*, 385 Mass. 140, 149-150, cert. denied, 457 U.S. 1137 (1982). See also *Commonwealth* v. *Vazquez*, 387 Mass. 96, 100 (1982) (concluding that mentally impaired person may waive Miranda rights and provide voluntary statement). There was evidence at trial that undercut the defendant's claim of a "psychological disability," and that evidence supported the Commonwealth's claim that the statement was the product of a rational mind, made voluntarily.

2. We next discuss the claims of prosecutorial misconduct. For the reasons explained below, we reject the defendant's contention that the three alleged acts of prosecutorial misconduct, considered as a whole, rise to the level of prejudicial error warranting relief.

(a) The prosecutor called Lieutenant Kenneth F. Martin, a certified bloodstain pattern and crime scene analyst of the State police, as a rebuttal witness. During Lieutenant Martin's testimony, a mannequin was brought into the court room for Martin to illustrate how a certain knife wound had been inflicted in the victim's back. The exercise was intended to show that the killer was right-handed, not left-handed as claimed by the defendant. The prosecutor did not obtain prior approval to use the mannequin. The defendant's trial counsel objected to the prosecutor's demonstration and asked for a mistrial.

The judge properly denied the motion for a mistrial. The judge admonished the prosecutor for not obtaining approval to use the mannequin. Nevertheless, the judge allowed its use, and, in so doing, exercised his discretion appropriately. See *Commonwealth* v. *Trowbridge*, 419 Mass. 750, 757 (1995).

(b) The prosecutor was granted permission by the judge to

speak to Charles J. Walsh, a forensic specialist, who had been retained by the defense to give expert testimony. (The need for the interview was caused by the failure of the defendant's trial counsel to comply reasonably with discovery obligations.) During a voir dire concerning the content of Walsh's testimony, Walsh indicated that the prosecutor told him that he (Walsh) would be invited to lecture at a local law school where the prosecutor's husband taught. Walsh also indicated that he had been reluctant, at one point, to testify for the defense. The suggestion now made by appellate counsel appears to be that the prosecutor had improperly attempted to influence Walsh.

The judge noted that the prosecutor's conversation with Walsh "certainly went beyond" the judge's intentions. Walsh made it clear, however, that his initial reluctance to testify for the defense had nothing to do with the prosecutor. See *Commonwealth* v. *Turner*, 37 Mass. App. Ct. 385, 387-388 (1994), citing *Webb* v. *Texas*, 409 U.S. 95, 98 (1972). Walsh ultimately testified for the defendant. The defendant has not shown the loss of any material testimony because of any action by the prosecutor. See *Commonwealth* v. *Colantonio*, 31 Mass. App. Ct. 299, 303 (1991).

(c) In response to questioning on direct examination by the prosecutor, a State police forensic chemist testified that she cut out a portion of the victim's underwear containing a stain, and sent the portion to Cellmark Diagnostic laboratory for DNA testing. A further question to the chemist by the prosecutor, asking whether additional testing had been performed, presumably by the defense, on a portion of the underwear sample that had been preserved for possible inspection by the defense, was met by an objection and a motion for a mistrial by trial counsel. The objection and motion were based on the contention that the prosecutor was improperly suggesting to the jury that the defense had an obligation to present favorable evidence as to the retained sample if such evidence existed. The judge sustained the objection to the prosecutor's question and denied the motion for a mistrial.

The judge did not abuse his discretion in denying the motion for a mistrial. See *Commonwealth* v. *Cunneen*, 389 Mass. 216, 223 (1983). In the sidebar conference held on the objection and

the motion, the prosecutor gave a good faith reason for asking the question. In any event, the question never was answered. Also, any improper suggestion contained in the prosecutor's question was cured by the judge, averting any prejudice to the defendant, as he promptly instructed the jury that there was no obligation on the part of the defendant to establish his innocence or to present evidence, and that any suggestion implicit in the prosecutor's last question was improper. Further, the jury were instructed both before trial commenced, and before they began deliberations, that the defendant is presumed innocent and does not have to prove his innocence, and that the questions posed by counsel are not evidence. The jury are presumed to follow the judge's instructions. *Commonwealth* v. *Sullivan*, 435 Mass. 722, 732 (2002).

3. The defendant contends that the judge erred in admitting the opinion testimony of an analyst from Cellmark Diagnostics laboratory, and that this erroneous admission of expert testimony, coupled with "other errors committed at trial," requires a new trial. The analyst offered her opinion that, based on statistical frequencies,[4] "no one other than [the defendant] is the donor of the DNA obtained from the sperm fraction of the vaginal swabs [of the victim]." After the witness stated her opinion, the defendant's trial counsel objected and moved to strike her testimony. The judge overruled the objection, stating that the ultimate issue for the jury was whether the Commonwealth proved beyond a reasonable doubt that the defendant killed the victim, not whether the defendant was the donor of sperm found inside the victim.

There was no error. The judge correctly noted that the expert's testimony did not touch on the ultimate issue in the case. Nor did the expert offer an opinion as to the defendant's guilt or innocence. See *Commonwealth* v. *Woods*, 419 Mass. 366, 375 (1995). The defendant's trial counsel was free to cross-examine the expert, or adduce rebuttal evidence, to establish that the DNA testing performed could not conclusively establish the donor of the sperm. That he did not apparently was a strategy

---

[4]The analyst testified that the likelihood that the donor of the sperm on the victim's vaginal swabs was a Caucasian other than the defendant was one in fifty-seven trillion.

decision made in light of the defendant's admission that he had had intercourse with the victim.

4. We have examined the record pursuant to our obligation under G. L. c. 278, § 33E. There is no basis to grant the defendant relief.

*Judgment affirmed.*