COMMONWEALTH *vs.* THAD T.,[1] a juvenile.

No. 01-P-500.

Middlesex. January 7, 2003. - October 6, 2003.

Present: LENK, CYPHER, & MILLS, JJ.

*Rape. Practice, Criminal,* Admissions and confessions, Voluntariness of state-
ment, Confrontation of witnesses, Instructions to jury. *Constitutional Law,*
Admissions and confessions, Confrontation of witnesses, Right to travel.
*Evidence,* Admissions and confessions, Voluntariness of statement, Expert
opinion, Fresh complaint. *Witness,* Expert.

At a criminal trial, the prosecutor did not violate the principles of *Doyle* v.
*Ohio,* 426 U.S. 610 (1976), by introducing evidence that the juvenile's
father invoked the juvenile's right to remain silent and terminated the
juvenile's interview with police, where the evidence was used neither as
evidence of guilt nor to impeach the juvenile at trial, but solely to avoid
juror confusion in light of the abrupt ending to the interview; further, the
admission in evidence of the juvenile's Miranda waiver form, which noted
that the juvenile had invoked his right to remain silent, was not error,
where voluntariness remained a live issue at trial, and where the form was
cumulative of the other testimony concerning the termination of the
interview. [500-504]

At the trial of complaints charging a juvenile with rape and indecent assault
and battery, the judge properly admitted testimony by an expert witness
that the juvenile was the source of deoxyribonucleic acid (DNA) evidence
found at the crime scene and on the victim's clothing, where the testimony
also indicated the probability that the DNA match might have occurred by
chance [504-506]; further, the testimony in question, which advanced no
new theory or underlying scientific research, did not require a hearing
under *Commonwealth* v. *Lanigan,* 419 Mass. 15 (1994) [506], and was
supported by an adequate foundation [506-507].

Where, at the trial of complaints against a juvenile defendant, a Com-
monwealth witness made an isolated reference to the juvenile being in
"lockup," the judge, by striking the entirety of the witness's testimony
from the record, removing the witness from the stand, and giving a cura-
tive instruction to the jury, did not impermissibly curtail the juvenile's
right under the Sixth Amendment to the United States Constitution to
confront the witnesses against him, and acted properly within his discre-
tion in denying the juvenile's motion for a mistrial. [507-508]

At the trial of complaints charging a juvenile with rape and indecent assault

---

[1] A pseudonym.

and battery, the judge did not err in permitting five fresh complaint witnesses to testify, where the witnesses' testimony did not exceed the boundaries placed on the use of fresh complaint testimony [509], and the judge's instructions to the jury on their use of fresh complaint testimony, including his definition of "corroboration," were proper [509-510].

COMPLAINT received and sworn to in the Ayer Division of the District Court Department on June 18, 1999.

The case was tried before *James M. Geary, Jr.,* J.

*Craig E. Collins* for the juvenile.

*David S. Leibowitz,* Assistant District Attorney, for the Commonwealth.

CYPHER, J. After a trial, a jury found the juvenile delinquent by reason of rape of a child with force (G. L. c. 265, § 22A) and indecent assault and battery on a child over the age of fourteen (G. L. c. 265, § 13H).[2] The juvenile claims that the judge erred in (1) admitting prejudicial evidence that the juvenile's right to remain silent was invoked; (2) admitting expert testimony that the juvenile was the source of deoxyribonucleic acid (DNA) evidence; (3) admitting prejudicial testimony that the juvenile was incarcerated; (4) permitting excessive fresh complaint witness testimony; (5) inadequately instructing the jury on fresh complaint evidence; and (6) banishing the juvenile, as part of his sentence, from the town of Groton. We affirm.

1. *Factual background.* We summarize the evidence, reserving certain details for discussion in connection with the issues raised. The juvenile and Victoria[3] met when the juvenile was twelve years old and Victoria was thirteen years old. They dated for a little while until Victoria broke off the relationship. In June of 1999, about two years after they first met, Victoria was fifteen years old and the juvenile was fourteen years old. They were friendly but not close, and they attended different schools.

_____

[2]The jury found the juvenile not delinquent on charges of assault with intent to rape a child and indecent assault and battery on a child over the age of fourteen (G. L. c. 265, §§ 24B and 13H, respectively) involving a different complainant.

[3]A pseudonym.

Commonwealth *v.* Thad T., a juvenile.

On Monday, June 7, 1999, the juvenile telephoned Jennifer's[4] house and spoke with Victoria. The juvenile told Victoria that he had something of hers. Believing that the juvenile was referring to a compact disc (CD) he had borrowed from her, she went to his home that afternoon.

When Victoria arrived at the house, the juvenile was sitting on the sofa. No one else was home. The juvenile greeted her with a hug and started to kiss her neck. Victoria pushed him away. He came toward Victoria and kissed her on the lips. Thinking that he was "kidding around," Victoria again pushed him away.

Victoria went to the stereo to get her CD. The juvenile pushed her onto a love seat but she got up. Victoria was surprised but still thought "he was just playing around because he always used to like kid around, beat on me and [Jennifer], but it was just a joke." Victoria told him to stop joking around.

As Victoria went toward the stereo to get her CD, the juvenile caused her to fall onto the sofa. She tried to get up but the juvenile put his hands on her shoulders and sat on her waist, straddling her. The juvenile was about ten inches taller and sixty pounds heavier than Victoria. The juvenile said, "[Y]ou know you want me." Victoria responded, "[N]o, stop; it's not funny."

The juvenile tried to kiss Victoria but she kept moving her head. He pinned her down and kept her head still, saying, "[Y]ou know you want me." While keeping her arms pinned to her sides, the juvenile moved closer to Victoria's head and unzipped his pants. Victoria repeatedly told him to stop. The juvenile responded by saying, "[D]on't fight 'cause you know you want me."

The juvenile forced Victoria's mouth open and stuck his penis in her mouth. The juvenile held her jaw open and moved his penis in and out of her mouth. The attack lasted approximately five minutes, concluding with the juvenile ejaculating in her mouth and on her face. Victoria spit out seminal fluid on the side of the sofa and the floor.

---

[4]Also a pseudonym. Jennifer, a neighbor of the juvenile, was the complainant in the charge for which the juvenile was found not delinquent.

Victoria quickly left. When she reached the front yard,. she started to cry. She stayed in the yard for a while because she did not want anyone to know she was upset and because the juvenile told her it was her fault. She went next door to Jennifer's house but did not tell her what happened until four days later.

Approximately one week after the assault, Victoria told another friend about the assault. This friend strongly encouraged Victoria to tell her parents, which Victoria then did. Nine days after the attack, she told Katrina Lee, a child interview specialist with the district attorney's office.

The police were directed to the location in the juvenile's home where Victoria stated that she had spat the seminal fluid. The police obtained cuttings from the sofa and carpet. Testing revealed the presence of seminal fluid mixed with saliva on the sofa cuttings and on Victoria's T-shirt.

The police interviewed the juvenile and the Commonwealth introduced the juvenile's statements at trial. The juvenile admitted that Victoria had been in his home on June 7, but denied sexual contact with her on that day. He told the police that he had deposited the semen on the sofa and carpet when he was alone.

The theory of the defense was that no sexual contact occurred between the juvenile and Victoria on June 7. Defense counsel challenged Victoria's account of June 7 through cross-examination and suggested that pressure from her friends forced Victoria to accuse the juvenile. Defense counsel also suggested that the DNA evidence on the sofa and Victoria's T-shirt was a result of previous consensual sexual conduct between the juvenile and Victoria. Defense counsel challenged the DNA testing and statistical analysis supporting the DNA analysis.

2. *Alleged Doyle violation.* The juvenile argues that the prosecutor, by introducing evidence of the juvenile's father terminating the interview with the police, improperly introduced evidence, in violation of the principles expressed in *Doyle* v. *Ohio,* 426 U.S. 610, 618-619 (1976), that the juvenile's right to silence was invoked. See *Commonwealth* v. *Fowler,* 431 Mass. 30, 38-39 (2000). The juvenile did not object on these grounds

at trial, so our review is limited to whether any error created a substantial risk of a miscarriage of justice. *Id.* at 41 n.19.

"The sine qua non of a *Doyle* violation is the government's use of the defendant's silence against him." *Commonwealth* v. *Waite,* 422 Mass. 792, 798 (1996). See *Greer* v. *Miller,* 483 U.S. 756, 763 (1987); *Commonwealth* v. *Caputo,* 439 Mass. 153, 166 (2003). The Commonwealth argues that the evidence was properly admitted to avoid juror confusion in light of the abrupt ending to the interview. We agree that in these circumstances, the juvenile's right to silence was not used against him, but rather was used to explain why the interview appeared to end abruptly and to avoid juror confusion. See *Commonwealth* v. *Habarek,* 402 Mass. 105, 110 (1988).

The jury heard evidence that the juvenile's mother had signed a Miranda waiver form indicating that she understood her son's rights, that the family had then consulted together without the police being present, that the juvenile had asked his parents a question about the form, and that the juvenile and both parents signed a second waiver form indicating that the juvenile wished to speak with Sergeant Jack Balonis. Sergeant Balonis interviewed the juvenile, in the presence of his parents, at the Groton police department.

During the interview, the juvenile told Sergeant Balonis that Victoria had come to his home for cigarettes. He said that when she arrived, his sister and a friend were also there. He did not provide the name of the friend. The juvenile said that he and Victoria kissed and sat on the couch, where they discussed making out but decided against it. The juvenile said he and Victoria watched television and made out for about ten minutes until Victoria wanted to stop. The juvenile stated that he did not touch Victoria in any other way.

Sergeant Balonis asked the juvenile if he knew what the forensic expert was looking for on the sofa and on the rug. The juvenile said that he thought she was looking for sperm. Sergeant Balonis asked the juvenile if sperm was found in those areas, where could it have come from? The juvenile appeared to be uncomfortable answering this question until his mother left the room. The juvenile then explained to Sergeant Balonis that

he had once deposited semen in that location when he was alone.

Sergeant Balonis asked the juvenile what he would say if the chemist found saliva mixed with the semen. The juvenile said that a previous sexual encounter with Victoria would explain such a result, but that on that occasion, Victoria had spat the seminal fluid in the kitchen sink.

Sergeant Balonis testified that, at this point, the juvenile's mother re-entered the room and the juvenile's father ended the interview.[5] The record establishes that the judge permitted the introduction of the evidence about the termination of the interview to explain the abrupt end of the questioning.[6] The judge was well aware of the potential for a *Doyle* error and, to ensure that no *Doyle* error occurred, did not permit the Commonwealth to introduce the father's full statement.

The jury had heard detail concerning the beginning of the interview, including the fact that the family had consulted together and signed waiver forms before the interview began. The jury also heard that the juvenile was interviewed in the presence of both parents, but that he became uncomfortable speaking in front of his mother and she left the room.

We think the evidence was properly admitted in these circumstances. Had the jury not understood that the mother had returned to the interview room and the father terminated the interview, they might well have wondered why the juvenile did not clarify his explanation concerning the mix of salvia and semen or why the interview ended when it did. The fact that the semen was mixed with saliva was an important component of the Commonwealth's case. Jurors may have speculated about the reason the juvenile did not provide a better answer to Sergeant Balonis's question on this point.

This is one of those circumstances in which introduction of the fact that a suspect invoked his rights served to explain an abrupt termination of the interview. See *Commonwealth* v. *Mar-*

[5]We assume, without deciding, that the principles of *Doyle* apply to the father's invocation of the juvenile's rights.

[6]The sidebar conferences concerning this issue are "inaudible." In accordance with Mass.R.A.P. 8(b)(3)(v), 388 Mass. 1110 (1983), and Mass.R. A.P. 8(e), 378 Mass. 934 (1979), the judge settled the content of the record.

*tinez,* 431 Mass. 168, 183 (2000) (invocation of right to silence did not constitute a *Doyle* violation where it was introduced in context of entire conversation so as not to leave jury wondering why interview terminated abruptly). Contrast *Commonwealth* v. *DePace,* 433 Mass. 379, 384 (2001) (confusion exception to *Doyle* did not apply where there was no evidence of any interview, much less one that ended abruptly); *Commonwealth* v. *Rendon-Alvarez,* 48 Mass. App. Ct. 140, 141 (1999) (*Doyle* exception did not apply where trooper's testimony could have ended smoothly with trooper describing last question asked and answered).

The juvenile also challenges the admission in evidence of the Miranda waiver form, which noted that the juvenile had invoked his rights. The juvenile claims that voluntariness was not a live issue at trial and therefore the form containing the notation "10:26 invoked rights" should not have been admitted, and Sergeant Balonis should not have read the notation out loud. However, the record, as settled by the trial judge, establishes that voluntariness remained a live issue at trial.[7]

Although the juvenile did not file a motion to suppress, it is understandable that the Commonwealth would lay the foundation for the admissibility of the juvenile's statements.[8] See *Commonwealth* v. *Adams,* 389 Mass. 265, 271 (1983) (even where a motion to suppress has not been filed, the Commonwealth, on seasonable objection, must demonstrate that

---

[7]The judge did not conduct a voir dire to determine whether the juvenile's statements were voluntary. See *Commonwealth* v. *Brady,* 380 Mass. 44, 48-49 (1980) (judge should conduct a voir dire on voluntariness, sua sponte, when there is evidence of a substantial claim of involuntariness). The judge did instruct the jury, in accordance with the humane practice, that they had to find that the juvenile's statements were voluntary beyond a reasonable doubt. *Commonwealth* v. *Tavares,* 385 Mass. 140, 152, cert. denied, 457 U.S. 1137 (1982).

[8]"The voluntariness of the waiver on the basis of Miranda and the voluntariness of the statements on due process grounds are separate and distinct issues but they are both determined in light of the totality of the circumstances and they share many of the same relevant factors." *Commonwealth* v. *Edwards,* 420 Mass. 666, 673 (1995). Evidence bearing on whether warnings were given and rights were validly waived is relevant to determining whether statements are voluntary. *Commonwealth* v. *Chung,* 378 Mass. 451, 458-459 & n.9 (1979). See Smith, Criminal Practice and Procedure § 1351 (2d ed. 1983).

statements were properly obtained and that defendant waived his rights); *Commonwealth* v. *Philip S.*, 414 Mass. 804, 808 (1993) (noting "special caution" applied to review of waiver of constitutional rights by juveniles). Cf. *Commonwealth* v. *Cain*, 361 Mass. 224, 228 (1972) (heavy burden on prosecution to prove voluntariness in juvenile context).

In these circumstances, it was not error for the prosecutor to introduce the Miranda waiver form and have Sergeant Balonis read the notation that the juvenile's rights were invoked.[9] Beyond Sergeant Balonis reading the form, it received no special treatment or emphasis. Contrast *Commonwealth* v. *DePace*, 433 Mass. at 385 (use of "video presenter monitor" maximized impact on jury of written form and request to speak to an attorney). The evidence of the notation on the form was cumulative of the testimony the jury heard concerning the termination of the interview. Contrast *Commonwealth* v. *Somers*, 44 Mass. App. Ct. 920, 923 (1998) (observing that signed Miranda rights form should not be admitted to show defendant was properly booked and warned if other testimony of such has already been introduced).

Most important, however, "at no time did the Commonwealth use . . . [the] response either as evidence of guilt or to impeach" the juvenile at trial. *Commonwealth* v. *Ferreira*, 381 Mass. 306, 314 (1980). Where the evidence is not used against the accused, there is no *Doyle* violation. See *Commonwealth* v. *Waite*, 422 Mass. at 798; *Commonwealth* v. *Martinez*, 431 Mass. at 183. Once the evidence concerning the father's invocation of the juvenile's rights was admitted in evidence, the prosecutor made no use of it, either in examination of any other witness or during closing argument.[10]

3. *Testimony that the juvenile was the source of the seminal*

---

[9]In addition, Sergeant Balonis's credibility remained an issue at trial.

[10]There was no error, but even if the admission of the evidence were construed as error, there is no substantial risk of a miscarriage of justice. In *Commonwealth* v. *Mahdi*, 388 Mass. 679, 694-698 (1983), the court described five non-exclusive factors that may be considered when determining the effect of a *Doyle* error. After applying these factors, and in particular the fact that the prosecution did not use the evidence against the juvenile, it is not plausible to conclude that the jury held the father's invocation of the juvenile's rights against the juvenile.

*fluid.* Dr. Robin Cotton, the laboratory director at Cellmark, testified that, to a reasonable degree of scientific certainty, the juvenile was the source of the semen traces found on both Victoria's T-shirt and the sofa cutting. The juvenile contends that this part of Dr. Cotton's opinion testimony violated *Commonwealth* v. *Lanigan*, 419 Mass. 15, 25 (1994), because (a) the testimony was phrased in qualitative terms rather than terms of statistical probability; (b) the testimony should have been subjected to a *Lanigan* hearing; and (c) there was an inadequate foundation for this portion of Dr. Cotton's testimony. The juvenile objected, so we review to determine whether there was any error, and if so, whether it was prejudicial.

Before Dr. Cotton testified, Juliette Harris, a DNA analyst at Cellmark, testified that she had concluded that the juvenile could not be excluded as the primary source of the DNA obtained from Victoria's T-shirt. Statistical analysis revealed that the frequency of the DNA profile taken from the T-shirt sample and the known sample of the juvenile occurs once out of approximately 69 trillion Caucasian people. Harris also testified that she had concluded that Victoria could not be excluded as a secondary source of the DNA obtained from the T-shirt.

Dr. Cotton testified that she was familiar with the statistical analysis performed on the DNA profiles.[11] She testified that with regard to Victoria's T-shirt, "you would expect or estimate to see that same profile in approximately one out of every 69 trillion [Caucasian] individuals[,] and for African Americans, that same estimate gives you a figure of one in 320 trillion people. In other words, the profile is rare."

Dr. Cotton then testified, and it is this portion of her testimony that the juvenile challenges, that in her opinion, and to a reasonable degree of scientific certainty, the juvenile was the source of the DNA on the sofa cutting and on Victoria's T-shirt.

a. *Qualitative opinion testimony.* There is nothing in *Lanigan* that suggests that an expert in DNA profiling may not opine that the DNA sample "matched" that of a defendant. Rather, *Lanigan* requires only that expert testimony concerning a DNA

---

[11]At trial, the juvenile registered no objection to Dr. Cotton's qualifications to provide the expert testimony asked of her concerning either the DNA testing performed or the statistical analysis of those test results.

match be accompanied by information indicating the probability that the match in question might have occurred by chance.[12] See *Lanigan*, 419 Mass. at 20. See also *Commonwealth* v. *Daggett*, 416 Mass. 347, 356-357 (1993) (Abrams, J. concurring).

Moreover, in *Commonwealth* v. *Girouard*, 436 Mass. 657, 669-670 (2002), the Supreme Judicial Court held that similar testimony concerning DNA profile evidence was admissible. There, the expert opined that, based on statistical frequencies (1 in 57 trillion Caucasian individuals), "no one other than [the defendant] is the donor of the DNA obtained from the sperm fraction of the vaginal swabs [of the victim]." *Id.* at 669.[13]

b. *Lanigan hearing.* The isolated portion of Dr. Cotton's testimony did not require a *Lanigan* hearing. No new theory or underlying scientific research was advanced. Dr. Cotton described the basis for her testimony, citing a number of genetic locations that were tested and the unique nature of the DNA profile. Dr. Cotton's opinion was merely an interpretation of the unique nature of the DNA profile. This portion of her opinion did not depend on the validity or accuracy of scientific testing, but rather on her credibility and reliability. See *Sacco* v. *Roupenian*, 409 Mass. 25, 29-30 (1990) (as long as those facts on which doctor's opinion is based are in evidence, question whether basis of doctor's opinion is sound goes to weight of evidence, not admissibility).

c. *Foundation.* There was an adequate foundation for Dr.

---

[12]Advancement in technology permits a conclusion that a profile may be said to be so unique if it is so rare that it becomes unreasonable to suppose that a second person in the population may have the same profile. National Research Council, Committee on DNA Technology in Forensic Science: Use of DNA Information in the Legal System 144 (1992). Other jurisdictions permit expert witnesses, in combination with methodologically-reliable testing results and statistical analyses, to offer their qualitative opinion whether a defendant is the source of a DNA sample. See *State* v. *Hummert*, 188 Ariz. 119, 121, 124 (1997); *State* v. *Zollo*, 36 Conn. App. 718, 723-724 (1995); *State* v. *Bloom*, 516 N.W.2d 159, 167-168 (Minn. 1994); *State* v. *Buckner*, 133 Wash. 2d 63, 66 (1997).

[13]Here, as in *Commonwealth* v. *Girouard*, the expert's testimony did not touch on the ultimate issue in the case, nor did the expert offer an opinion as to the juvenile's guilt or innocence. *Commonwealth* v. *Girouard*, 436 Mass. at 669. The ultimate issue here is not whether the DNA in fact belonged to the juvenile, but rather whether the victim consented to the activity. Thus, the expert's opinion testimony did not touch on the ultimate issue.

Cotton's testimony. The Commonwealth established Dr. Cotton's credentials, including her expertise in biology and biochemistry, her position as director of Cellmark, and her previous testimony in 160 cases involving DNA and statistical interpretation. She was qualified to offer expert testimony of this nature. See *Commonwealth* v. *Duarte*, 56 Mass. App. Ct. 714, 723 (2002). See also *Commonwealth* v. *Fryar*, 425 Mass. 237, 251, cert. denied, 522 U.S. 1033 (1997) (discussing sufficiency of qualifications of expert witness). Moreover, the jury had before it other evidence that left little, if any, room for a conclusion that the DNA samples belonged to someone other than the juvenile.

4. *Testimony concerning incarceration.* The Commonwealth called Jack,[14] another juvenile, to testify about statements the juvenile had made while incarcerated and awaiting trial. The statements were expected to directly contradict the juvenile's statements regarding his conduct with Victoria. The judge had allowed defense counsel's motion in limine to prevent any references to the juvenile's pretrial incarceration. Nevertheless, during direct examination, but before providing any relevant testimony, Jack referred to the juvenile being in "lockup." Defense counsel objected and moved for a mistrial. The Commonwealth urged the judge to issue a curative instruction. Instead, because the judge was concerned that Jack would repeat the mistake, the judge struck Jack's testimony and did not permit him to testify further. The judge instructed the jury to disregard the struck testimony. The Commonwealth and the juvenile objected. The judge concluded that, considering the context in which the witness had referred to the "lockup," no irreparable harm had occurred. The judge pointed out that the reference was general, and did not involve a specific date or place.

The juvenile claims on appeal that by removing Jack from the witness stand, the judge impermissibly curtailed the juvenile's Sixth Amendment right to confront witnesses. The juvenile initially objected to the particular remedy employed, but he did not do so on the ground that the judge violated his confrontation rights. *Commonwealth* v. *Fowler*, 431 Mass. 30,

[14]A pseudonym.

41 n.19 (2000). Accordingly, review is under the standard whether there is a substantial risk of a miscarriage of justice. In fact, when the judge denied the juvenile's motion for a mistrial, the juvenile requested that the testimony of the witness be struck and that the witness not be recalled.

We conclude that removing the witness from the stand did not violate the juvenile's confrontation rights. The entire testimony of the witness had been struck from the record; therefore, the juvenile was not presented with testimony that he could not challenge. Cf. *Commonwealth* v. *Funches*, 379 Mass. 283, 291-294 (1979) (where a valid claim of Fifth Amendment privilege prevents a defendant from cross-examining a witness, witness's direct testimony should be struck, unless testimony that would have been elicited on cross-examination was merely collateral or cumulative). The juvenile does not suggest what testimony he would have elicited. Defense counsel indicated that he did not intend to inquire into the location of the conversation. Jack provided no other relevant testimony.

The judge acted within his discretion in denying the motion for mistrial. *Commonwealth* v. *Davis*, 380 Mass. 1, 11 (1980) (within judge's discretion to deny motion for mistrial when a prosecution witness, who had begun to give direct testimony, suffered a heart attack and was unable to complete direct testimony or to stand cross-examination, where court promptly struck witness' testimony). Promptly striking the lone and ambiguous reference and instructing the jury not to consider it were sufficient. "[W]e shall not assume that jurors will slight strong and precise instructions of the trial judge to disregard the matters which have been withdrawn from their consideration." *Commonwealth* v. *Gordon*, 356 Mass. 598, 604 (1970). Only a compelling showing of ineradicable prejudice would cause us to conclude that the judge's instructions to disregard Jack's testimony were inadequate. Cf. *Commonwealth* v. *Richards*, 363 Mass. 299, 308-310 (1973) (prejudice from witness's volunteered statement that he had committed other robberies with defendant was sufficiently cured by trial judge's prompt and forceful instruction to disregard statement); *Commonwealth* v. *Kilburn*, 426 Mass. 31, 38 (1997) (curative instructions are adequate means to correct jury's exposure to inadmissible evidence). The juvenile has made no such showing.

5. *Fresh complaint witnesses.* The juvenile claims that the judge erred in permitting five fresh complaint witnesses to testify. Three fresh complaint witnesses testified concerning Victoria's allegations. Two fresh complaint witnesses testified concerning Jennifer's allegations, for which the juvenile was found not delinquent.

There is no defined limit to the number of fresh complaint witnesses who may testify. *Commonwealth* v. *Lorenzetti*, 48 Mass. App. Ct. 37, 42 (1999) (allowing five fresh complaint witnesses to testify in case involving single victim). Here, the witnesses' testimony did not exceed the boundaries placed on the use of fresh complaint testimony. They testified only about the fact of the complaint or the details of the attack as related by Victoria. See *Commonwealth* v. *Peters*, 429 Mass. 22, 27 (1999).

6. *Jury instructions on fresh complaint.* The juvenile argues that the jury instructions on fresh complaint were inadequate, especially concerning the definition of "corroboration." The juvenile never registered this objection at trial; therefore, we consider whether there was a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Densten*, 23 Mass. App. Ct. 981, 982 (1987).

There was no error. Corroborative testimony has been described as "testimony which tends to strengthen, confirm or make more certain the testimony of another witness." *Commonwealth* v. *Gardner*, 30 Mass. App. Ct. 515, 523 (1991), quoting from *State* v. *Bellamy*, 64 N.C. App. 454, 459 (1983). Before the testimony of the first fresh complaint witness, the judge defined corroborate as evidence which "confirm[s] or support[s] the credibility of [the complainant's] in-court trial testimony."

With each fresh complaint witness, the judge reinforced to the jury the limitations on their consideration of the testimony. See *Commonwealth* v. *Scanlon*, 412 Mass. 664, 674 (1992) ("in light of the judge's previous explanations regarding the use of the fresh complaint testimony, we think the judge's final charge was sufficient to remind the jurors of the limited purposes of such testimony"). In his final charge, the judge properly limited the fresh complaint evidence, telling the jury: "If you determine

the statements were made and were made reasonably promptly, again, you may consider them only as corroboration of [Victoria's] and [Jennifer's] testimony in court and not — not as . . . substantive evidence that sexual assault in fact occurred." There was no error.

7. *Banishment from Groton.* The judge committed the juvenile to the Department of Youth Services (department) and imposed a condition that the juvenile stay out of the town of Groton. The juvenile challenges the court's authority to banish him, as part of his sentence, from the town of Groton until his eighteenth birthday. The juvenile contends that the judge had no authority to banish him from an entire town and that the banishment violated art. 12 of the Massachusetts Declaration of Rights.[15] The juvenile also argues that the banishment infringed the authority of the department to send the juvenile home to his parents whenever a conditional release is in the public interest. See G. L. c. 120, § 6.

It appears to us from the record that the juvenile has now attained the age of eighteen; therefore, we need not reach the question whether the banishment was constitutional or whether it met the requirements set forth in *Commonwealth* v. *Pike*, 428 Mass. 393, 402-405 (1998) (suggesting that probation conditions barring probationers from certain small geographic areas might be permissible where they serve goals of probation). We note, however, that when a juvenile is found delinquent, a judge "may place the case on file *or* may place the child in the care of a probation officer for such time and on such conditions as it deems appropriate *or* may commit him to the custody of the department of youth services . . ." (emphasis added). G. L. c. 119, § 58. Thus, it does not appear that where, as here, the juvenile has been committed to the department, the juvenile may also be placed on probation for the same conviction. The court may, of course, make recommendations to the department regarding any conditions of the juvenile's commitment with the department. See *ibid.*

*Judgment affirmed.*

---

[15]"No subject shall be . . . exiled . . . but by the judgment of his peers, or the law of the land."